## UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| *JW Aluminum Company*, <br><br> Plaintiff, <br><br> v. <br><br> *ACE American Insurance Company*, <br> *Starr Technical Risks Agency, Inc.*, <br> *Westport Insurance Corporation*, <br> *AIG Specialty Insurance Company*, <br> & <br> *General Security Indemnity Company of Arizona*, <br><br> Defendants. | Case No. **2:21-cv-1034-BHH** <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, JW Aluminum Company ("JWA") brings this Complaint for declaratory judgment, breach of contract, and bad faith refusal to pay insurance benefits[1] against the Insurers, as further defined below, and alleges as follows:

### NATURE OF THE ACTION

1.      JWA seeks damages for Insurers' wrongful refusal to pay for over $100 million in repair costs incurred and business interruption losses suffered by JWA as a result of a devastating fire at one of its aluminum smelting and production facilities in Goose Creek, South Carolina on August 4, 2020 (the "Cast House Fire"). The insurance benefits are due and owed under JWA's all-risk property insurance policies issued by Defendants for the calendar year 2020 with a limit of $250 million per occurrence (collectively, the "All-Risk Policy").

---

[1] AIG and Westport are not included in JWA's bad faith claim because JWA received a good faith payment from Westport and AIG for a portion of the claim.

2.      The Cast House Fire caused significant damage to the roof of the production facility, and to the continuous casting equipment, which JWA was forced to shut down.  Because of Defendants' unreasonable refusal to pay even undisputed amounts owed under the All-Risk Policy, JWA has been unable to repair the facility, recover valuable raw materials "frozen" in the casting equipment, or resume normal operations.  JWA's significant losses will continue to grow until cast house repairs are completed and operations resumed.

3.      The timing of the fire, and Insurers' wrongful refusal to pay, could not have come at a more unfortunate time – when the demand for aluminum of the type produced by JWA was extremely high and prices elevated due to government tariffs imposed on imports.

4.      Despite accepting the substantial premiums JWA paid for the All-Risk Policy, Defendants have refused to pay JWA's loss in full and have taken months to issue even small advances on the undisputed portions of JWA's loss.  Two of the Insurers, ACE and GSINDA, continue to withhold payments on the fabricated theory that JWA had signaled an intent to remove the equipment in the Cast House from coverage, even though there were no such instructions, and the equipment was onsite and operating as of the date of the loss.

5.      Months after the Cast House Fire, all the Defendants still refuse to pay JWA's covered losses in excess of $10 million, despite the express terms of the Policy, which "insures against all risks of direct physical loss or damage to Property Insured from perils not otherwise excluded" up to Policy limits of $250 million.  Fire is a peril not excluded under the Policy. Defendants do not assert that the cause of loss or damage is excluded, but instead that they provided a supplementary coverage extension for "direct physical loss or damage cause (*sic*) by heat from Molten Material, which has been accidentally discharged from equipment," and that the extension operates as an exclusion for any loss incurred by JWA beyond the $10 million sub-limit of

coverage afforded by the extension.  This position contradicts a plain reading of the Policy language and South Carolina law, and is likewise contrary to the undisputed fact that JWA's losses result from a covered cause of loss – namely, fire – not from "heat."

6.      JWA brings this lawsuit to establish its rights to coverage under the All-Risk Policy, and for damages due to JWA as a result of Defendants' wrongful denial of coverage and unreasonable refusal to pay benefits.

## THE PARTIES

7.      Plaintiff JWA is incorporated in the state of Delaware with its principal place of business in South Carolina.

8.      Defendant ACE American Insurance Company ("ACE") is incorporated in Pennsylvania with its principal place of business in Pennsylvania.  ACE agreed to indemnify JWA for 45% of the amounts recoverable under the All-Risk Policy issued to JWA under Policy No. EPRN14338688.

9.      Defendant Starr Technical Risks Agency, Inc. ("Starr") is incorporated in New York with a principal place of business in New York.  Starr issued and administered Policy No. EPRN14338688 in conjunction with ACE.

10.      Defendant Westport Insurance Corporation ("Westport") is incorporated in Missouri with its principal place of business in Kansas.  Westport agreed to indemnify JWA for 27.5% of the amounts recoverable under the All-Risk Policy issued to JWA under Policy No. NAP045191707.

11.      Defendant AIG Specialty Insurance Company ("AIG") is a corporation incorporated in Illinois with its principal place of business in New York.  AIG agreed to indemnify JWA for 15% of the amounts recoverable under the All-Risk Policy issued to JWA under Policy No. 18257132.

12.     Defendant General Security Indemnity Company of Arizona ("GSINDA") is a corporation incorporated in Arizona with its principal place of business in New York.  GSINDA agreed to indemnify JWA for 12.5% of the amounts recoverable under the All-Risk Policy issued to JWA under Policy No. FA0064010-2019-1.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 2201, 2202, 1332(a), and Rule 57 of the Federal Rules of Civil Procedure.

14.     There is an actual and justiciable controversy between JWA and the Defendants within the meaning of 28 U.S.C. § 2201 regarding Defendants' obligation to indemnify JWA under the All-Risk Policy for the losses sustained as a result of the Cast House Fire.

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in South Carolina, the site of the Cast House Fire, and the property damaged by the Cast House Fire is located in South Carolina.

17.     Defendants each issued the insurance policy that is the subject of this lawsuit to JWA in the state of South Carolina, and thus are subject to personal jurisdiction in this Court.

## FACTUAL ALLEGATIONS

18.     JWA owns and operates facilities and equipment for the melting, processing, and finishing of aluminum at 435 Old Mount Holly Road, Goose Creek, SC 29445 ("Mount Holly Location").  JWA completed construction in June 2020 of an expansion facility ("Boilermaker Facility") with new, state-of-the-art equipment to increase capacity at the Mount Holly Location.

19.    The pre-existing production line at the Mount Holly Location was housed in the original cast house ("Cast House").  At the time of the Cast House Fire, JWA was in the process of ramping up production and testing the new equipment, known as commissioning, at the Boilermaker Facility. Meanwhile, the Cast House was operating at full capacity.

20.    The Cast House operated a continuous cast production line, with melted aluminum always running through the casting and processing equipment.  Raw aluminum was first heated in gas-fired melting furnaces and then transferred to holding furnaces, and then fed into a production line of roll casters to produce various types of aluminum coils.  The coil could then be sold as aluminum coil or further finished in cold roll mills for different ultimate end uses.

### A.    The Cast House Fire

21.    On August 4, 2020 at approximately 2:15 PM, two long-tenured JWA employees were draining aluminum from a holding tank into a drain mold in preparation for routine maintenance work.  Approximately two minutes after beginning to drain the aluminum, the employees heard a "pop" from the mold, followed by a second pop approximately one minute after the first.  After the second pop, an employee noticed an "orange glow" on the upward-facing flange of the steel purlin[2] directly above the work area, which was approximately 35 feet in the air.

22.    The "orange glow" ignited combustible dust on the upward-facing flange, causing the flame to spread into a slow, fuse-like burning event along the purlin (the "Dust Fire").

---

[2] A purlin is a horizontal beam or bar used for structural support as part of the roof.

5

23.     Combustible dust is a known hazard in the aluminum industry[3] and is subject to comprehensive safety standards issued by the National Fire Protection Association.[4]

24.     Aluminum Association safety bulletins identify accumulation of aluminum dust particles as potential flammable or explosive hazards depending on the mixture of coarser and finer materials.[5]

25.     Potentially flammable dusts have previously been identified at JWA's facilities, including on hard-to-reach, upward-facing surfaces like the purlin, where the Dust Fire began.

26.      The local fire department identified "dust, fiber, lint" as the item first ignited.

27.     Subsequent investigations by JWA identified "flammable dust" as a contributing factor to the Dust Fire.

28.     A fire can occur only when four necessary elements exist: (1) oxygen; (2) heat; (3) fuel; and (4) uninhibited chemical reaction.[6] This is known as the "fire tetrahedron."[7] If any one of these elements is removed there will not be a fire.[8]

---

[3] OSHA Health and Safety Bulletin, Combustible Dust in Industry: Preventing and Mitigating the Effects of Fire and Explosions, SHIB 07-31-2005, at pg. 4.

[4] NFPA 652, Standard on the Fundamentals of Combustible Dust; NFPA 484, Standard for Combustible Metals, Metal Powders, and Metal Dusts.  Additionally, 29 CFR 1910.22(a)(1) requires employers to keep workplaces and other areas clean, which includes the removal of combustible dust accumulations.

[5] Aluminum Association's Bulletin F-1, "Guidelines for Handling Aluminum Fines Generated During Various Aluminum Fabricating Operations." The Aluminum Association, www.aluminum.org.

[6] NFPA 921, Guide for Fire and Explosion Investigations; Image taken from https://www.sc.edu/ehs/training/Fire/01_triangle.htm

[7] NFPA 921, Guide for Fire and Explosion Investigations; *See also* https://www.nfpa.org/News-and-Research/Publications-and-media/Press-Room/Reporters-Guide-to-Fire-and-NFPA/All-about-fire

[8] NFPA 921, Guide for Fire and Explosion Investigations.



**FIRE TETRAHEDRON**

29.    Each of these four elements was present in the Dust Fire. A freak accident arose because material or a spark "popped" out of the aluminum in the drain mold and flew more than 30 feet into the air, landing on the purlin, combining with oxygen in the atmosphere to ignite combustible dust on the purlin.  The simultaneous presence of all three elements caused a chemical reaction which resulted in combustion, and thus an uncontrolled fire. The absence of any one element would preclude such a reaction.

30.    As the Dust Fire spread throughout the rafters in the Cast House Building, the sustained heat from the burning combustible dust ignited the fiberglass roofing, causing a secondary fire (the "Roof Fire"), leading to the conflagration that became the Cast House Fire. Just as with the Dust Fire, each element of the fire tetrahedron was present as the cast house fiberglass roof ignited.  The burning combustible dust provided the heat source, fiberglass roofing material provided the fuel source, and oxygen was available from the atmosphere.   The spreading Roof Fire threatened to damage natural gas and electric lines serving the building, and JWA shut down the continuous casting line to avoid further damage and injury to personnel.

B.    **JWA's Response to the Cast House Fire**

31.    After they observed the fire, JWA personnel took steps to contain its spread and cover equipment in the vicinity to prevent damage from falling sparks.  Simultaneously, they contacted the fire department, which arrived shortly thereafter.

32.    As part of containment measures, electricity and gas feeds were completely shut off from the melting and casting areas of the Cast House shortly after the Cast House Fire began. This step prevented further damage and harm to personnel that would have resulted had fire reached active power or gas supply lines.

33.    The fire department and JWA were able to control and extinguish the fire later in the day on August 4, 2020.  JWA immediately began taking action to reduce losses and inspect the damage, including construction of barriers to prevent fire-extinguishment water infiltration to other areas of the Mount Holly Location, removing equipment and materials from the vicinity of the damaged portions of the Cast House, and further securing the area.

34.    As a result of the damage to the roof and Cast House, as well as concern regarding damage to the power and gas lines, the melters and holders could not be re-started in time to prevent the molten aluminum in the Cast House's production line from solidifying in place.

35.    The solidification of aluminum in the Cast House production line has caused damage to the equipment and machinery.  Removal of the now-solid aluminum will require a labor-intensive process of chipping out the aluminum, because the aluminum cannot be re-melted in place without causing further damage.

36.    The Cast House Fire caused damage to structures and equipment from water inundation, falling debris, and exposure to heat from the fire.  In particular, the roof of the Cast House suffered extensive damage and will need substantial repairs and construction work, for which repair bids were submitted to Defendants.

8

37.     JWA's losses as a result of the Cast House Fire are ongoing but are conservatively estimated to be in excess of $100 million dollars.

**C.**     **The All-Risk Policy**

38.     JWA paid all required premiums to Defendants for the All-Risk Policy, which was in effect for the entire calendar year 2020, including when the Cast House Fire occurred.

39.     In the All-Risk Policy, Defendants committed that they "severally, but not jointly, agree to indemnify the Insured for the amount recoverable in accordance with the terms and conditions of the Policy." Defendants each agreed to insure a specified percentage of JWA's losses as outlined in the All-Risk Policy, with each Defendant responsible for only its specified percentage of coverage.

40.     The All-Risk Policy "insures against all risks of direct physical loss or damage to Property Insured from perils not otherwise excluded."

41.     The Property Insured by the All-Risk Policy was "property at the Premises Described in the Declarations unless otherwise excluded" and included "[r]eal property, including improvements and betterments, owned by the Insured, or in which the Insured has an Insurable Interest" as well as "[p]ersonal property owned by the Insured." The building, structures, equipment, and machinery damaged by the Cast House Fire were real property and personal property insured by the All-Risk Policy.

42.     The fire that damaged the Cast House is a peril not excluded from the All-Risk Policy. The fire caused direct physical loss or damage to JWA's insured property within the meaning of the Policy.

43.     The All-Risk Policy did not contain any exclusion or endorsement removing any equipment or machinery owned by JWA from coverage, nor does the Policy permit the Insurers to

declare such equipment or machinery to be removed from coverage based upon its declared value, its depreciation, any planned change of usage, or even a planned discontinuation of use.

44.     The All-Risk Policy also included endorsements extending coverage for business interruption losses, including "loss directly resulting from the necessary interruption of the business incurred by the Insured," when losses extend beyond the policy period.  Defendants' obligation to indemnify JWA for business interruption losses "shall not be limited by the expiration of this policy," and business interruption losses resulting from the Cast House Fire are ongoing.

### D.    **JWA's Notice of Loss**

45.     JWA submitted its initial notice of loss from the Cast House Fire to Defendants on August 11, 2020.

46.     Defendants retained Sedgwick to investigate and adjust the losses resulting from the Cast House Fire.  Sedgwick Senior General Adjuster Brian Bennett was appointed as the adjuster on behalf of Defendants, and requested extensive evidence regarding the fire's cause, scope, and impact.  JWA submitted the requested information, including photographs, video recordings, and documentary evidence and reports.

47.     JWA fully cooperated with the adjustors, permitting inspectors from Sedgwick and Engineering Design & Testing Corp., a firm retained by Defendants, to inspect the Cast House and site of the Cast House Fire on multiple occasions.

48.     JWA also provided repair cost estimates, including expert reports assessing the structural damage and repairs required, bids for roof repairs, demolition work, aluminum salvage and reclamation, and equipment repair or replacements.  Defendants received documentation establishing these costs.

49.     JWA is also suffering ongoing business interruption losses because its Cast House had operated as a continuous cast facility, and thus it is losing business while its equipment is

damaged and offline due to the presence of solidified aluminum. JWA's losses have been exacerbated by the price increase for aluminum leading up to and continuing after the Cast House Fire.

50.    JWA continues to incur additional direct losses as a result of the Cast House Fire, including regular costs to maintain the damaged Cast House roof and manage rainwater runoff at the site of the fire.

51.    JWA's business interruption losses are magnified because it had planned for the Cast House's operations to continue while the new Boilermaker Facility was in the early stage of its mandatory 120-day ramp-up and commissioning period, which began July 10, 2020. The Boilermaker Facility was not designed to replace the Cast House's production capacity, but to enhance JWA's overall capacity. JWA specifically sought permitting and utility flexibility that would allow full operations of both facilities to permit the Cast House to remain online even after the Boilermaker Facility was completed.

52.    After working with Defendants' appointed representatives for more than six months, assisting in their efforts to evaluate and value the impact of the Cast House Fire on JWA's business, JWA submitted an up-to-date business interruption claim analysis to Defendants on March 18, 2021.

53.    JWA has satisfied all conditions precedent to coverage.

**E.    Defendants' Denials and Refusals**

54.    The Insurers wrongfully refused JWA's requests for full payment of its covered losses from the Cast House Fire.

**1.    Defendants' Wrongful Denial of Claims Above $10 Million**

55.    The Defendants contend that JWA's covered losses for the Cast House Fire are limited to $10 million of additional coverage provided under the Molten Material Endorsement for

"direct physical loss or damage cause (*sic*) by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of liability of $10,000,000 per occurrence."

56.    But JWA's claim is not for physical loss or damage that is caused "directly" by "heat from Molten Material," (*i.e.* melting, expanding, cracking, or similar damage caused by proximity to a molten metal), but rather is for losses suffered as a result of the Cast House Fire – the product of combustion.  The Cast House Fire required the ignition of the Dust Fire and then the Roof Fire, each of which was the result of the combination of heat, ignitable material, and oxygen. Fire is not heat damage within the meaning of the molten metal extension and, therefore, JWA's losses are not subject to the sublimit afforded by the extension.

57.    AIG refused to pay any amount beyond its pro-rata share of JWA's losses up to $10 million because "[b]ased on the investigation conducted to date, it appears that the Claim is comprised of direct physical loss or damage caused by heat from Molten Material."  AIG provided no support for its contention and did not provide any details of its "investigation."

58.    AIG's position was reiterated in a letter from its counsel based on the following unsupported assumption:

> Molten Aluminum (*sic*) was physically expelled from equipment following a "pop." The Molten aluminum that was expelled and released after the "pop" came into contact with a steel beam in the roof area of the building. As the molten aluminum is at a temperature in excess of 1,400°, such heat from the molten aluminum ignited a fire on the roof which generated a shutdown of equipment and the resulting loss.

59.    ACE/Starr, Westport, and GSINDA similarly refused to pay JWA's losses above $10 million because "the Molten Material Endorsement limits coverage for 'direct physical loss or damage caused by heat from Molten Material,' to $10,000,000 per occurrence" and "the fire

was directly caused by the heat of the Molten Material that was accidentally discharged. This led to the resulting shutdown and damage that is involved in the claim."

60.    ACE/Starr, Westport, and GSINDA based this contention on the following assumed facts:

1) Workers performing maintenance on equipment drained molten aluminum; 2) Molten aluminum "popped," sending molten metal (over 1400 degrees) 30 feet into air onto a steel beam; 3) Steel beam heated up and ignited fire on composite roof; 4) Workers shut down power to other equipment and, by doing so, caused molten aluminum to solidify in other machines.

61.    The Insurers admit that the "molten aluminum" only came into contact with the steel purlin and do not contend that any spark or material from the drain mold came into direct contact with the fiberglass roof.

62.    Their letters also omit that both the fire department and JWA's post-fire investigation (which was conducted in cooperation with the Insurers) revealed the presence of combustible dust as a necessary element of the Dust Fire. This omission of the Dust Fire creates the false impression that the Cast House Fire was caused by "direct" exposure to heat from molten material, when in fact heat from the Dust Fire ignited the roofing material and caused the Cast House Fire and JWA's loss.

63.    Further, none of the Insurers provided support for their contention that the spark or material – estimated to be less than one ounce of material – expelled from the drain mold was of sufficient volume to heat the steel purlin to a high enough temperature to ignite the fiberglass roof.

64.    The Insurers' unsupported and incomplete statement of facts is insufficient to support their contention that the Molten Material endorsement limits JWA's recovery for the Cast House Fire.

2. __ACE/Starr and GSINDA's Failure to Pay Undisputed Amounts Owed__

65.    ACE/Starr and GSINDA contend that they understood that JWA had "removed" the Cast House Equipment from coverage despite never receiving a request from JWA to this effect.[9]  Of course, the Cast House equipment was in place and operational leading up to the fire and was damaged as a result of the fire.  Despite this contention, neither ACE/Starr nor GSINDA has identified a single provision in the All-Risk Policy that supports their refusal to pay.

66.    In September 2020, in light of the magnitude of the loss already documented and established, as well as the immediate costs required to repair the Cast House in order to avoid the ongoing costs associated with managing the damaged roof and fire site, JWA requested an advance payment of $6 million to cover undisputed portions of JWA's insurance claim to allow it to begin work on repairs and removing the solidified aluminum from the Cast House equipment. On September 30, 2020, Defendants agreed to pay at least $1 million in undisputed damage to the Cast House building.

67.    Mr. Bennett, on behalf of ACE/Starr and GSINDA,[10] sent JWA a letter responding to the request for the $6 million advance payment, asserting a "complete reservation of rights," and a request for information unrelated to the advance ("Reservation of Rights Letter").

68.    The Reservation of Rights Letter contains ACE/Starr and GSINDA's improper assertion that the Cast House equipment was removed from coverage, based on a misquotation of an email from JWA's insurance broker.  According to ACE/Starr and GSINDA, they were led to believe that some portion of the equipment in the Cast House "was intended to be scrapped and

---

[9] AIG and Westport initially refused payment on these grounds as well, but subsequently agreed to pay their respective shares of JWA's claim up to the $10 million Molten Material Endorsement.  JWA received these payments in January 2021.

[10] The letter was sent on behalf of all four Defendants, but Westport and AIG eventually paid their portion of the loss below $10 million.

removed from coverage under the Policies effective July 1, 2020 because the Insured had built a new facility."

69.     JWA had no plans to remove or scrap any equipment in the Cast House in 2020. As part of the Boilermaker expansion project, JWA incurred substantial additional costs to obtain a permitting structure and expand mechanical and electrical utilities to allow both the Cast House and the Boilermaker Facility to be operated concurrently.

70.     However, the ACE/Starr and GSINDA were advised that when the Boilermaker Facility was added to the All-Risk Policy effective July 1, 2020, certain equipment values would be updated and reallocated as part of this process.

71.     This reallocation was necessary to avoid the double counting of certain equipment that JWA had already added to the declared values of the All-Risk Policy.  During construction of the Boilermaker Facility, JWA accepted early delivery of state-of-the-art equipment intended for the expansion.  JWA added the value of that equipment to the declared values at the Mount Holly Location (where the equipment was stored) under the All-Risk Policy to ensure the equipment was covered after JWA accepted delivery.  Once construction was completed at the Boilermaker Facility, the new facility was added to the All-Risk Policy and the additional value was deducted from the declared value for the Cast House and reallocated to the declared value for the Boilermaker Facility.

72.     Despite their full knowledge that JWA did not "scrap" or destroy any of its perfectly operational and profitable equipment at the Cast House (and had no intention to do so), ACE/Starr and GSINDA still "reserve[d] their rights to disclaim coverage for the damage to the equipment as a result of the fire to the extent that such equipment was deleted from coverage under the Policies as of July 1, 2020."

73.    ACE/Starr and GSINDA's untenable position was evident, even on the face of the Reservation of Rights Letter, which acknowledged that JWA's changes on July 1, 2020, resulted in a net increase in declared value at the Mount Holly Location.  It quoted the endorsement added to the All-Risk Policy as "adding Boilermaker Insurable Value of $212,294,765 and deleting $60,000,000 in equipment for a net impact of $152,294,765."

74.    Further, ACE/Starr and GSINDA failed to articulate any basis for their assertion that the equipment actually damaged in the Cast House Fire could have been removed from coverage without notice to JWA or reduction in premium.  Instead, they appear to contend that JWA was planning to eventually retire some equipment in the Cast House – a plan overtaken by market events, and contradicted by the fact that the equipment was in operation at the time of the loss.  Even if there had been plans to retire the equipment, there is no provision in the All-Risk Policy that would exclude from coverage any equipment that "was in the process of phasing out." Coverage applies to all real and personal property "owned by the Insured" and "at the Premises Described in the Declarations unless otherwise excluded."

75.    ACE/Starr and GSINDA's obfuscation about JWA's plans in the Reservation of Rights Letter has no bearing on the ownership status of the property at the Cast House that was damaged, and thus no relevance to whether ACE/Starr and GSINDA are liable to indemnify JWA for its damage or loss.  The only types of property excluded by the All-Risk Policy, found in the section entitled "Property Excluded," are based on features of the property itself, not any plans the insured may have had for that property.  ACE/Starr and GSINDA's deliberate misstatement of the relevant facts is a transparent, self-serving attempt to improperly deprive JWA of its rights to coverage under the Policy.

76.    The All-Risk Policy does not obligate JWA to specify or schedule specific pieces of equipment as covered or uncovered.

77.    Despite receiving a prompt explanation as to the alleged misunderstanding, as well as urgent and repeated requests for payment by JWA, ACE/Starr and GSINDA failed to fully pay even the $1 million advance they promised to pay at the end of December 2020.

78.    Instead, they continued to "investigate" their alleged "misunderstanding," issuing a further request for documents and demand for an examination under oath of JWA employees on December 30, 2020.  These manipulations have caused JWA to incur substantial legal fees to satisfy ACE/Starr and GSINDA's unreasonable requests.

79.    ACE/Starr and GSINDA's continuing and unjustified delays and unreasonable refusals to pay benefits has placed their insured in a position of severe financial strain and unnecessary additional hardship that would have been avoidable had ACE/Starr and GSINDA promptly acknowledged and met their obligations under the All-Risk Policy.

## COUNT 1 – DECLARATORY JUDGMENT (All Defendants)

80.    JWA incorporates the allegations set forth in the other paragraphs of this Complaint as if set forth fully herein.

81.    There is an actual, justiciable controversy that is ripe for determination because JWA has made demands for insurance coverage and payment of losses under the All-Risk Policy, and Defendants have refused all payments and rejected all proofs of loss submitted.

82.    Defendants' improper delay and unreasonable refusals to pay caused increased harm and losses to JWA.

83.    Defendants' delay was without reasonable basis.

84.    Defendants' refusals to pay were without reasonable basis.

85.    JWA seeks a declaration that it is entitled to insurance coverage under the All-Risk Policy for its losses resulting from the Cast House Fire.

86.    All conditions precedent to JWA's rights to coverage have been satisfied to the extent required for the declaration of coverage sought herein.

87.    No applicable exclusions or limitations of coverage apply to JWA's claims for coverage.

88.    A declaration of JWA's rights to coverage will resolve the disputes among them.

**COUNT 2 - BREACH OF INSURANCE CONTRACT (All Defendants)**

89.    JWA incorporates the allegations set forth in the other paragraphs of this Complaint as if set forth fully herein.

90.    The All-Risk Policy was a valid, enforceable contract for insurance between JWA and Defendants.

91.    JWA paid the premiums required for the insurance coverage Defendants offered in the All-Risk Policy.

92.    JWA suffered covered losses under the All-Risk Policy resulting from the Cast House Fire.

93.    JWA timely and properly submitted notice of its insurance claims and the requested proofs of loss to Defendants for the losses resulting from the Cast House Fire.

94.    By refusing to pay for JWA's covered losses, Defendants have breached their contractual obligations to JWA under the All-Risk Policy.

95.    As a result of Defendants' breaches of the All-Risk Policy, JWA has suffered harm and continues to suffer additional damages in the form of property damage, ongoing expenses, ongoing business interruption as a result of being unable to begin repair or recovery work on the

Cast House, its equipment, and the frozen aluminum in the Cast House equipment, as well as other consequential damages requiring further investigation and the costs of this litigation.

### COUNT 3 – INSURANCE BAD FAITH (ACE, Starr, and GSINDA only)

96.    JWA incorporates the allegations set forth in the other paragraphs of this Complaint as if set forth fully herein.

97.    Implied in every insurance contract made in South Carolina is a covenant of good faith and fair dealing.

98.    ACE, Starr, and GSINDA have acted, and continue to act, unreasonably and in bad faith by refusing to reasonably interpret the Policy according to its plain and unambiguous language, requesting irrelevant and non-existent information, improperly delaying undisputed insurance benefits, and unreasonably refusing to provide coverage.

99.    ACE, Starr, and GSINDA's breach of the implied covenant of good faith and fair dealing is willful, wanton, and in reckless disregard of JWA's rights under the All-Risk Policy.

100.    ACE, Starr, and GSINDA's conduct has caused JWA to sustain damages in the form of litigation costs and expenses, attorneys' fees, and lost business income and lost business opportunity.

101.    JWA is entitled to judgment awarding it actual and punitive damages in amounts to be determined by motion or at trial for ACE, Starr, and GSINDA's improper delay in paying undisputed benefits, unreasonable refusal to pay insurance benefits, and failure to properly and fairly adjust JWA's claim in good faith.

102.    As a result of ACE, Starr, and GSINDA's bad faith refusal to provide coverage within 90 days of JWA's demand for coverage, JWA is entitled to recover its attorneys' fees incurred in prosecuting this action pursuant to S.C. Code Section 38-59-40.

## PRAYER FOR RELIEF

103.    JWA respectfully asks the Court to enter judgment awarding the following relief:

      a.    A declaration that JWA is entitled to insurance coverage from Defendants under the All-Risk Policy for losses resulting from the Cast House Fire;

      b.    Judgment that Defendants have breached the All-Risk Policy;

      c.    An award of damages for JWA's losses resulting from the Cast House Fire in the amounts to be proven at trial, currently estimated at more than $100 million and growing;

      d.    An award of damages for ACE, Starr, and GSINDA's improper delay and unreasonable refusal to pay their respective shares of JWA's losses up to at least $10 million in the amounts to be proven at trial, but no less than $75,000;

      e.    All other consequential damages caused by Defendants' improper delay and unreasonable refusals to pay JWA the required benefits under the All-Risk Policy;

      f.    An award of appropriate pre-judgment interest for the unpaid amounts from the date the payments were due, and post-judgment interest;

      g.    An award of the costs of suit;

      h.    An award of attorneys' fees;

      i.    An award of punitive damages; and

      j.    Other legal and equitable relief as may be deemed just or proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts that are so triable.

Respectfully submitted,

s/Rita Bolt Barker

Matthew Richardson (D.S.C. No. 7791)
WYCHE, P.A.
807 Gervais Street, Suite 301
Columbia, South Carolina 29201
Telephone: 803-254-6642
Facsimile: 803-254-6544
Email: mrichardson@wyche.com

Rita Bolt Barker (D.S.C No. 10566)
200 East Camperdown Way
Post Office Box 728
Greenville, SC, 29602-0728
Telephone: 864-242-8235
Facsimile: 864-235-8900
Email: rbarker@wyche.com

Peter M. Gillon
Brendan Hogan
*(Pro Hac Vice Applications Forthcoming)*
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036-3006
Telephone: +1-202-663-8120
Email: Brendan.hogan@pillsburylaw.com

Dated: April 7, 2021                    ***Attorneys for Plaintiff***