UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| JW ALUMINUM COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:21-cv-1034-BHH |
| | ) | |
| v. | ) | **Opinion and Order** |
| | ) | |
| ACE AMERICAN INSURANCE | ) | |
| COMPANY, WESTPORT INSURANCE | ) | |
| CORPORATION, AIG SPECIALTY | ) | |
| INSURANCE COMPANY, and | ) | |
| GENERAL SECURITY INDEMNITY | ) | |
| COMPANY OF ARIZONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff JW Aluminum Company ("JWA") brings this action seeking declaratory judgment that Defendants ACE American Insurance Company ("ACE"), Westport Insurance Corporation ("Westport"), AIG Specialty Insurance Company's ("AIG"), and General Security Indemnity Company of Arizona's ("GSINDA") (collectively, "Insurers") are required to cover its fire loss claim under its All-Risk insurance policies (the "Policies"). (ECF No. 1.) JWA also asserts claims for breach of contract and bad faith. (*Id*.) ACE, Westport, and GSINDA have asserted a counterclaim for reformation of the Policies. (ECF No. 65.)

Pending before the Court are the following motions:

- Insurers' motion for summary judgment on JWA's declaratory judgment and breach of contract claims, or in the alternative, in favor of Insurers on limiting coverage pursuant to the Policies' Molten Material Endorsement and limiting JWA's equipment claim to the actual cash value, and for summary judgment on JWA's bad faith claim. (ECF No. 118.)

- JWA's motion for summary judgment on its declaratory judgment and breach of contract claims based on the Policies' Molten Material Endorsement and for summary judgment on the reformation counterclaim filed by ACE, Westport, and GSINDA. (ECF No. 115.)

- ACE and GSINDA's *Daubert* motion to exclude or limit the testimony of Michael Quinn, JWA's bad faith expert. (ECF No. 113.)

- Insurers' motion for summary judgment on JWA's cast coil damages claim. (ECF No. 117.)

- Insurers' *Daubert* motion to exclude the report of Ibrahim Yucel, JWA's expert in support of its cast coil damages claim. (ECF No. 120.)

The motions have been fully and extensively briefed. The Court held a hearing on the motions on November 28, 2023. (ECF No. 160.) Now, for the reasons set forth herein, the Court denies in part and grants in part JWA's motion for summary judgment (ECF No. 115); denies in part and grants in part Insurers' motion for summary judgment (ECF No. 118); denies in part and grants in part ACE and GSINDA's *Daubert* motion to exclude or limit the testimony of Mr. Quinn (ECF No. 113); denies without prejudice Insurers' motion for partial summary judgment on JWA's cast coil damages claim (ECF No. 117); and denies without prejudice Insurers' *Daubert* motion to exclude the report of Mr. Yucel. (ECF No. 120.)

## I.    BACKGROUND

JWA was founded in South Carolina and owns and operates facilities and equipment for the melting, processing, and finishing of aluminum at 435 Old Mount Holly Road, Goose Creek, South Carolina (the "Mt. Holly Facility"). (ECF No. 115 at 3-4.) The Mt. Holly Facility is comprised of two buildings: the "Legacy Building," containing a variety of finishing, rolling, melting, and casting equipment (the "Legacy Equipment"), and the "Boilermaker Building," a newer building that began operations in July 2020. (*Id.* at 6.) At

2

the time of the loss resulting in the claim in dispute, JWA was running the Legacy Equipment concurrently with the equipment in the Boilermaker Building. (*Id.*)

**The Policies**

In 2019, Insurers[1] issued JWA four separate all-risk insurance Policies[2] covering JWA's facilities around the country, including the Mt. Holly Facility, for the year 2020. (*Id.* at 6.) The Policies provide blanket coverage from all risks, unless otherwise excluded, for all property at JWA's locations. (*Id.* at 4. *See generally id.* at Ex. 5.) The Policies provide coverage for losses to JWA's real property and personal property at the Mt. Holly Facility, unless specifically excluded. (*Id.* at 6-7; *id.* at Ex. 5 at 16.) Similarly, the Policies provide coverage for physical loss or damage from all perils other than those specifically excluded. (*Id.* at Ex. 5 at 16.) As stated in the Policies' Insuring Agreement:

A. Perils Insured

This policy insures against all risks of direct physical loss or damage to Property insured from perils not otherwise excluded, subject to the terms and conditions of this policy.

In the event of such direct physical loss or damage . . . such damage, without the intervention of any other independent cause, results in a sequence of events which causes physical damage to other Property insured by this policy, then this policy will cover such resulting loss or damage.

---

[1] JWA purchased one policy from Defendant ACE and Starr Technical Risks Agency Inc. ("Starr"), which is why there are references in the documents to ACE/Starr, ACE, or Starr. (ECF No. 115 at 14 n. 75 ("ACE and Starr have a partnership wherein ACE provides the paper and funding for policies, but the policies themselves are underwritten and claims thereunder are handled by Starr.").) Starr was initially named as a Defendant in this matter until July 2021, when JWA filed a Voluntary Dismissal Without Prejudice. (*See* ECF No. 26.)

[2] While there are four separate contracts of insurance issued by four separate entities, there are no discernable differences in the language of the Policies relevant to the motions before the Court. Thus, for sake of brevity, unless otherwise indicated, all citations to language from the Policies will be to the ACE policy only. (*See* ECF No. 115 at Ex. 5.) As noted by JWA, "ACE was the lead insurer on JWA's account and held the largest share of JWA's coverage. This version of the Policy, which was issued by Defendant ACE, was labeled by ACE as the 'complete' version of the Policy and includes endorsements made during the Policy period and even following its expiration." (*Id.* at 6 n.7.)

(*Id*. at Ex. 5 at 16.)

To assist Insurers in calculating premiums, JWA had to prepare and periodically update a Statement of Values ("SOV"), which listed the total insured value ("TIV") at each of JWA's properties, including the Mt. Holly Facility. (*Id.* at 7.) Insurers would apply a single rate to the total value of all property to calculate premiums. (*Id.*) SOVs were high-level, bare-bones spreadsheets listing the total values attributed to a handful of categories of property (i.e., a single value each for "Building," "Contents," "Equipment," and "Business Income" at each of JWA's locations). (*Id.*) SOVs did not operate as schedules of covered property, serve to take property in or out of coverage, or define or limit coverage; in fact, SOVs are not even referenced in the Policies. (*Id; see generally id*. at Ex. 5.) Because the Policies provided coverage for all of JWA's property unless otherwise excluded, JWA was not required to, was never asked to, and never did provide a list of the specific property behind the values listed in its SOVs. (*Id.* at 7.) Nor did Insurers maintain their own list of equipment in existence at the Mt. Holly Facility. (*Id.*)

The Policies contain several endorsements that change the Policies. The instant dispute centers around the Boilermaker Endorsements and the Molten Material Endorsement.

<u>Boilermaker Endorsements</u>

On June 15, 2020, Lindsay Grimes, an employee of Marsh USA Inc. ("Marsh"),[3] sent four identical emails to each Insurer, subject line: "JW Aluminum – Boilermaker effective 7/1/20," that read in pertinent part:

> Effective 7/1/2020, boilermaker will officially be operational and coming off builder's risk.

---

[3] Marsh was JWA's insurance broker and was authorized to bind and modify insurance coverage on JWA's behalf. (*See* ECF No. 118 at Ex. 2 & Ex. 4 at 15:1-17:12.)

….

The additional values for Boilermaker are $212,294,765.
- $23,860,579 building values
- $178, 434, 186 equipment values
- $10,000,000 BI values

At the same time, JW is scraping $60,000,000 of equipment at the existing Mt. Holly building.

The net TIV impact is $152,294,765.

….

Please confirm your agreement.

(*Id.* at 9-10; see *id.* at Exs. 17-20.)

In response, Insurers individually confirmed this change at varying times and eventually issued like endorsements[4] (the "Boilermaker Endorsements"), effective July 1, 2020, reflecting this requested change. (*Id.* at 10.) The Boilermaker Endorsement issued by ACE most closely mirrored Ms. Grimes's email. It stated:

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

In consideration of an additional premium of $43,271 it is hereby understood and agreed the following is added to the policy:

Boilermaker Facility
Values:    $23,860,579 Building
           $178, 434,186 Equipment
           $10,000,000 Business Interruption
           $212,294,765 Total Value

Furthermore, $60,000,000 in equipment is deleted as respects to the 435 Old Mount Holly Road, Mt. Holly, SC 29445 location. The Equipment Value for this location is amended to $109, 342, 392.

---

[4] The ACE Endorsement was issued on January 4, 2023 (ECF No. 115 at Ex. 21); the GSINDA Endorsement was issued on July 17, 2020 (*id.* at Ex. 22); the Westport Endorsement was confirmed on August 10, 2020 (*id.* at Exs. 23-24); and the AIG Endorsement was confirmed on September 10, 2020. (*Id.* at Ex. 25.)

5

ALL OTHER TERMS AND CONDITION REMAIN UNCHANGED.

(*Id.* at Ex. 5 at 106.) GSINDA and AIG used identical language as to the $60 million value change in their respective Boilermaker Endorsements:

> And, it is hereby agreed that the following values are deleted from the below location:
> 1. 435 Old Mt. Holly Rd
> Mt. Holly, SC 29445
> TIV removed: $60,000,000
>
> Net TIV Added: $152, 294,765

(ECF No. 119 at Ex. 6 at 55 and Ex. 8 at 115.) Lastly, the Westport Boilermaker Endorsement read, in relevant part: "Effective 7/1/2020, adding Boilermaker Insurable Value of $212,294,765 and deleting $60,000,000 in equipment for a net impact of $152,294,765 at location 435 Old Mt. Holly . . . ." (*Id.* at Ex. 7 at 105.)

### *Why the Change?*

The parties dispute the reasons for the change.

### According to Insurers

In late 2019, as part of the insurance renewal process, the Insurers conducted a Property Loss Inspection Survey of the Mount Holly Facility. (ECF No. 118 at 5.) At that inspection, JWA advised that its "plans are to remove the existing melt furnaces, holding furnaces, casters and the melt shop building" when Boilermaker comes online. (*Id; see id.* at Ex. 24 & Ex. 25 at 21:16-23:14.) Then, in October 2019, JWA gave a presentation to the Insurers' underwriters for consideration in the renewal process. (*Id.* at 6; *see also* ECF No. 119 at Ex. 10.) Present at this meeting were Ms. Grimes, Michael LeDuc of Starr as underwriter for ACE, Louis Panas as underwriter for GSINDA, and Tracy Green as underwriter for Westport. (ECF No. 118 at 6.) Insurers assert that JWA told the

underwriters that the values for the new Boilermaker Equipment would be added to the Policies and that $60 million of "out of service" equipment would be removed from coverage, when the Boilermaker started up. (*Id*.) They also contend that JWA included the below slide in its presentation to the underwriters:



(*Id.*)

Then, on June 15, 2020, Ms. Grimes sent emails to Insurers requesting that the Insurers remove $60 million of equipment effective July 1, 2020. (*Id.* at 4.) The Insurers agreed to do so and issued endorsements changing the Policies to reflect the fact that equipment was removed from coverage. (*Id.*) After a lengthy investigation into which equipment comprised the $60 million value coming off coverage, Insurers ultimately determined that the Legacy Equipment damaged by the loss giving rise to the claim was removed from coverage effective July 1, 2020, via the Boilermaker Endorsements. (*Id.*)

<u>According to JWA</u>

In December 2019, two pieces of equipment (the "Mino-Hazelett Equipment") were stored in the Legacy Building for eventual installation in the Boilermaker Building, which was still in construction. (ECF No. 115 at 8.) The value of the Mino-Hazelett Equipment, $47 million, was added to the SOV for the Legacy Building that was submitted to Insurers in preparation for the Policies' renewals in December 2019. (*Id.*) According to JWA, once the Boilermaker Building was completed, the Mino-Hazelett Equipment was to be moved into that building, and its value would be removed from the Legacy Building SOV and added to the Boilermaker SOV. (*Id.*)

In the spring of 2020, while the Boilermaker Building was still under construction, JWA was exploring a sale of the company to a private equity firm, Lindsay Goldberg. (*Id.*) If the sale to Lindsay Goldberg occurred, the firm would execute what JWA had termed "Boilermaker Phase II" – an expensive and involved plan to replace the Legacy Equipment with new rolling equipment. (*Id.*) However, by summer 2020, negotiations with Lindsay Goldberg fell apart and plans for Phase II were put on hold indefinitely. (*Id.* at 9.)

In June of 2020, the Boilermaker Building was nearly finished, and JWA asserts that it began to arrange for the value of the Boilermaker building and its equipment to be added to the Policies effective July 1, 2020. (*Id.*) In preparation for this, it asked that Grimes send out the above June 15, 2020, email to Insurers. (*Id.*) According to JWA, the reason for the $60 million reduction was twofold. First, the $212 million SOV for the Boilermaker Building included the $47 million value of the Mino-Hazlett Equipment. (*Id.*) However, the Legacy Building SOV also included the value of the Mino-Hazelett Equipment because it was being stored in the Legacy Building while the Boilermaker

Building was under construction. (*Id.*) If the $47 million remained in the Legacy Building SOV, then the Policies would double count the value of the Mino-Hazelett Equipment; JWA asserts that as a result, JWA would unnecessarily pay a higher premium. (*Id.*) Second, the remaining $13 million reduction was to account for the proper repair and replacement value of foundation work that Phil Cavatoni, JWA's Chief Financial Officer, had evaluated in adjusting the SOV for purposes of adding the Boilermaker. (*Id.* at 9-10.)

As to the October 2019 meeting, JWA states that the noted slide merely showed how JWA's facility and insurance needs would change if JWA received board approval and funding to proceed with Phase II. (ECF No. 131 at 5.) At the time of the meeting, JWA was in Phase I (i.e., construction of the Boilermaker Building) and, due to uncertainties surrounding Phase II, the "slide was moved to the end of the presentation and was not shown during the meeting with the Insurers." (*Id.* at 6. *See id.* at Ex. 7 at 47:3-7.)

<u>Molten Material Endorsement</u>

The Molten Material Endorsement in the Policies creates a $10 million sublimit of liability for a specific cause of loss:

> … this policy does insure against direct physical loss or damage cause [sic] by heat from Molten Material, which has been accidentally discharged from equipment, subject to a limit of $10,000,000 per occurrence.

 (ECF No. 115 at Ex. 5 at 65.)

**The August 4, 2020, Loss**

On August 4, 2020, a piece of molten metal accidentally discharged from the Legacy Equipment while operating and landed on an I-beam supporting the roof above. (*Id.* at 11-12.) That molten aluminum "ignited combustible aluminum dust" on the I-beam, resulting in a dust fire that "burned in both directions down the beam." (*Id.* at 12.) According to one of JWA's experts:

> Based on the completed testing, the hypothesis that a fire initiation due to heating of aluminum dust on structural members due to molten aluminum splatter, which led to the ignition of the aluminum dust, was tested, is consistent with all available data, and is the most probable cause of the fire event that occurred at JW Aluminum on August 4, 2020.

(ECF No. 119 at Ex. 35 at 35.) After 20 to 30 minutes, the "the sustained heat from the Dust Fire ignited fiberglass roofing above the I-Beam," resulting in a roof fire that threatened to damage natural gas and electric lines serving the Legacy Building. (ECF No. 115 at 12-13.) Pursuant to safety protocols, JWA shut down the gas and electric lines and, as a result, molten aluminum froze inside equipment in unwanted places. (*Id.* at 13.) Once on the scene, the fire department used water to extinguish the fires. (*Id.*)

JWA hired Hatch Associates Consultants to assess the damage. (*See id.* at Ex. 28.) Hatch determined that JWA suffered "extensive damage to the [Legacy] [B]uilding, infrastructure and process equipment" from exposure to extreme heat from the fire, falling debris from the roof, the freezing of molten metal in unwanted places, and the inundation of water. (*Id.* at Ex. 28 at 6.)

**Resulting Claim & Investigation**

JWA submitted an initial "notice of loss" to Insurers on August 11, 2020. (*Id.* at 13; *see id.* at Ex. 29.) Brian Bennett of Sedgwick, on behalf of Insurers, investigated and adjusted the claim resulting from the August 4, 2020, loss. (*Id.*) The first inspection occurred on August 13, 2020, and the second one occurred on August 19, 2020. (ECF No. 118 at 15-16.)

<u>The $60 million dollar question</u>

After the second inspection, Insurers had questions regarding the Boilermaker Endorsements – specifically, **<u>which</u>** equipment comprised the $60 million value that was

removed from coverage (hereinafter referred to as, the "SOV Issue"). (*Id.* at 16.) On September 17, 2020, JWA told Insurers that the $60 million equipment value adjustment was unrelated to the damaged Legacy Equipment; rather, this value accounted for a reduction in TIV based on double-counting of the Mino-Hazelett Equipment and miscellaneous other adjustments. (ECF No. 115 at 14; *see id.* at Ex. 36 (September 17, 2020, email from Chris Huskins of Marsh to Brian Bennett of Sedgwick).) Insurers thought JWA's explanation contradicted what JWA had said in the October 2019 meeting, and they were unable to locate pre-loss documentary evidence to support JWA's explanation. (ECF No. 118 at 16.) On September 29, 2020, Insurers told Mr. Bennett that they have all agreed to a $1 million advance to JWA – not the $6 million advance requested by JWA on September 8, 2020[5] – for the Legacy Building damage, while "the machinery and equipment issues related to the SOV [Issue] are sorted out." (ECF No. 119 at Ex. 47 at 2-3.)

The next day (September 30, 2020), Insurers sent a reservation of rights letter to JWA, informing JWA: (1) that their investigation is being conducted under a full reservation of rights; (2) that their understanding is that the Legacy Equipment was intended to be removed from coverage effective July 1, 2020, because the Insured had built a new facility, which was operational in the beginning of July 2020, and referencing Ms. Grimes's June 15, 2020 email and the Boilermaker Endorsements; and (3) that they are requesting information and documents about the "scrapped" equipment. (ECF No. 115 at Ex. 30.)

---

[5] (*See* ECF No. 115 at Ex. 37 at 2.)

On November 6, 2020, JWA responded, stating that "at no point did JW[A] remove or "scrap" any equipment" from the Legacy Building and reiterating its "double counting" explanation set forth in Mr. Huskins's September 17, 2020, email. (ECF No. 119 at Ex. 55.) JWA noted, "at no time did Underwriters raise questions or seek clarification if there was any confusion about the changes in valuation." (*Id.* at Ex. 55 at 3.) JWA further explained that its expansion plans were broken into two phases, Phase I and Phase II. (*Id.* at Ex. 55 at 3-4.) Phase I included the construction and start-up of the Boilermaker Building, to run concurrently with the Legacy Building, and no equipment was removed or decommissioned; Phase II was the decommissioning phase of the expansion, however, it was never approved by JWA's Board of Directors. (*Id.*) Consequently, JWA informed Insurers that no responsive documents existed because it was not "scrapping" any equipment at the Legacy Building. (*Id.* at Ex. 55 at 5-6.)

On November 12, 2020, Insurers acknowledged JWA's letter but stated that "[t]o properly assess [it], [they] require the information requested in [their] September 20, 2020 letter" about "the listing of equipment JW[A] was scrapping/scraping" at the Legacy Building "effective 7/1/20, as stated in the emails [sent by Ms. Grimes to each Insurer]." (ECF No. 115 at Ex. 31 at 2.) JWA responded in a letter dated November 23, 2020, stating:

> Repeating your requests does not change our responses. There are no documents related to "Scrapping" any equipment because as I explained in detail in my prior letter, JW[A] planned to continue to operate the existing equipment at the Mount Holly location even after the completion of the first phase of the expansion project.

(ECF No. 119 at Ex. 57 at 3.)

In letters dated December 16 and 30, 2020, Insurers continued to seek information and documents between JWA and Marsh that "led to the issuance of Ms. Grimes's June 15, 2020 email request." (ECF No. 119 at Exs. 58 & 59.) In the latter correspondence, Insurers, except for AIG, (hereinafter, "the ACE Insurers") also requested JWA appear for an Examination Under Oath ("EUO") on February 17, 2021. (*Id.* at Ex. 59.) The day prior, AIG made the decision to distance itself from the other Insurers' decision to press the SOV Issue and request an EUO. (ECF No. 115 at 15; *see id.* at Ex. 39 ("We are separating ourselves from that process."); *see also* ECF No. 133 at Ex. D at 214:11-216:20 (AIG underwriter testifying that despite unanswered questions on valuation, "what AIG felt was we got everything we're ever gonna get from JW[A], and we needed to take a position" and "at the time, we did not have a level of information to support that position").)[6]

In an email dated February 5, 2021, ACE Insurers followed up with JWA, seeking documents and demanding an EUO. (ECF No. 119 at Ex. 61 at 2.) In a letter dated February 11, 2021, JWA's counsel stated that it "will provide any additional documents reasonably related to the Mount Holly Fire as soon as it has completed its further internal review." (*Id.* at Ex. 62 at 5.) The letter also accused ACE Insurers: (1) of ignoring JWA's explanation for the valuation change and response that it has no responsive documents; (2) of failing to cooperate during the investigation period; and (3) of failing to provide a reasonable basis for the scope of the requested information. (*See generally id.* at Ex. 62.)

On March 2, 2021, JWA produced approximately 30,000 pages of documents to Insurers along with a letter containing a "summary of the events and references to key

---

[6] An AIG underwriter was not present at the October 2019 meeting. (*See* ECF No. 133 at Ex. D at 99:5-20 & Ex. B at 93:10-19.)

documents included within its production." (*Id.* at Ex. 63 at 5-8 (discussing, among other items, the SOV adjustment, changes to Phase II expansion plans after completion of Phase I, and the status of Phase II at the time of loss).) However, in a letter dated May 12, 2021, ACE Insurers informed JWA that none of the documents produced clarified the SOV Issue. (*See* ECF No. 119 at Ex. 64.) JWA, through its corporate representatives Stan Brant and Phil Cavatoni, eventually sat for the EUO on March 23, 2022. (ECF No. 115 at 15.)

The $10 million dollar question

On September 29, 2020, AIG brought the Molten Material Endorsement to the attention of ACE. (*See id.* at Ex. 40 at 3.) On October 1, 2020, Mr. Bennett of Sedgwick asked ACE to review and provide its interpretation of this Endorsement, as he "d[id] not recall seeing this in a policy or prior loss situation." (*Id.* at Ex. 41 at 2.) Mr. Bennett also alerted Mr. Huskins of Marsh to the potential applicability of this Endorsement to JWA's claim. (*See* ECF No. 119 at Ex. 54.) On October 6, 2020, Mr. Huskins advised JWA of this Endorsement's $10 million sublimit and advised JWA to send it to legal counsel right away. (*Id.*)

Insurers raised the potential applicability of this Endorsement to the claim directly to JWA in its November 12, 2020, letter, discussed above. (*See* ECF No. 115 at Ex. 31 at 3 (stating that no decision has been made yet but ""[i]t is our understanding that the heat from molten material was the precipitating cause of the damage to the Insured's property").) JWA's November 23, 2020, letter in response expressed surprise that Insurers were raising this Endorsement "months after the investigation of the cause of

loss has been completed." (ECF No. 119 at Ex. 57 at 3.) Mr. Cavatoni also expressed

therein his personal interpretation of this Endorsement:

> My assessment of this endorsement is that it applies to melting or damage
> to equipment caused by exposure to molten aluminum. As the instant loss
> is a fire that began as a result of flammable dust that was ignited by a small
> spark that flew over 30 feet into the air, I fail to see how this endorsement
> applies.

(*Id.*)

On January 8, 2021, based on the Molten Material Endorsement, two Insurers,

AIG and Westport,[7] made partial payments to JWA based on their respective shares of

the $10 million sublimit. (*See* ECF No. 115 at 16.)

### JWA Files Suit

On April 7, 2021, JWA filed the instant lawsuit against Insurers seeking to compel

coverage for the August 4, 2020, loss. (ECF No. 1.) JWA's Complaint seeks declaratory

judgment and breach of contract against Insurers and asserts a bad faith cause of action

against ACE and GSINDA. (*Id.*)

### Denial of Claim

On June 29, 2022, ACE Insurers formally denied coverage of JWA's claim. (*See*

ECF No. 115 at Ex. 44.) ACE Insurers determined that the Legacy Equipment "was

removed from coverage prior to the Loss" based on the Boilermaker Endorsements and

that, "if coverage were to apply, the Policy's molten material per occurrence sublimit

applies to limit coverage to a maximum of $10,000,000." (ECF No. 119 at Ex. 66 at 2.)

---

[7] Westport's payment was made subject to a complete reservation of rights. (*See* ECF No. 119 at Ex. 64 at 3.)

## II.    PENDING MOTIONS

Insurers filed a motion for summary judgment on JWA's declaratory judgment and breach of contract claims, or in the alternative, in favor of Insurers limiting coverage for JWA's entire claim to $10 million per the Molten Material Endorsement and limiting coverage for JWA's equipment claim to its actual cash value. (ECF No. 118.) Insurers also seek summary judgment on JWA's bad faith claim against ACE and GSINDA. (*Id.*)

JWA filed a motion for summary judgment on its declaratory judgment and breach of contract claims based on the Policies' Molten Material Endorsement and for summary judgment on the reformation counterclaim filed by ACE, Westport, and GSINDA. (ECF No. 115.)

ACE and GSINDA filed a *Daubert* motion to exclude or limit the testimony of Michael Quinn, JWA's bad faith expert. (ECF No. 113.)

Insurers filed a motion seeking summary judgment on JWA's cast coil damages claim. (ECF No. 117.)

Insurers filed a *Daubert* motion to exclude the report of Ibrahim Yucel, JWA's expert in support of its cast coil damages claim. (ECF No. 120.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Stone v.*

*Liberty Mut. Ins. Co.*, 105 F.3d 188, 190 (4th Cir. 1997) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Any reasonable inferences are to be drawn in favor of the nonmoving party. See *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact. See Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. *See Anderson*, 477 U.S. at 252; *Stone*, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. The non-movant must then "make a showing

17

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

Where a motion for summary judgment presents a question as to the construction of a written contract, if the language employed by the agreement is plain and unambiguous, the question is one of law and can be properly disposed of at summary judgment. *Hansen v. United Servs. Auto. Assoc.*, 565 S.E.2d 114, 116 (S.C. Ct. App. 2002). However, where the motion for summary judgment presents a question as to the construction of a written contract, and the contract is ambiguous because the intent of the parties cannot be gathered from the four corners of the instrument, summary judgment is improper. *Gilliland v. Elmwood Props.*, 391 S.E.2d 577, 579 (1990). An ambiguous contract is a contract capable of being understood in more than one way or a contract unclear in meaning because it expresses its purpose in an indefinite manner. *Klutts Resort Realty, Inc. v. Down'Round Dev. Corp.*, 232 S.E.2d 20, 25 (1977).

## IV.    CHOICE OF LAW

"In a diversity case, a federal court must apply the choice of law rules of the state in which it is located." *Okatie Hotel Group, LLC v. Amerisure Ins. Co.*, No. Civ.A. 2:04-2212-23, 2006 WL 91577 (D.S.C. Jan. 13, 2006) (citing *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *Builders Mut. Ins. Co. v. Wingard Props.*, No. 4:07-cv-2179-TLW, 2010 WL 3893701 (D.S.C. Sept. 28, 2010). In cases concerning an insurance policy's scope of coverage, South Carolina traditionally applies the law of the state in which the application for insurance was made and where the policy was formed. *See, e.g., Unisun Ins. Co. v. Hertz Rental Corp.*, 436 S.E.2d 182 (S.C. Ct. App. 1993); *Bowman v. Cont'l Ins. Co.*, 229 F.3d 1141 (4th Cir. 2000).

South Carolina, by statute, modified this traditional rule. *See* S.C. Code § 38-61-10 ("All contract of insurance on property, lives, or interests in this State are considered to be made in the State … and are subject to the laws of this State."); *Bowman*, 229 F.3d at 2. Courts, however, continue to consider the factual circumstances of a case in deciding whether S.C. Code § 38-61-10 (2015) or South Carolina's traditional choice of law rules applies. *See, e.g., Unisun Ins. Co.*, 436 S.E.2d at 182; *Bowman,* 229 F.3d at 114.

The parties do not dispute that South Carolina law applies, as the policies were issued in South Carolina and the insured property at issue is located in South Carolina. *See Unisun Ins. Co.*, 436 S.E.2d at 184-85. The Court thus considers the parties' motions under South Carolina law.

## V.    ANALYSIS

### A.  South Carolina Principles of Contract Construction

As articulately summed up by the South Carolina Supreme Court in *Garrett v. Pilot Life Ins. Co.*, 128 S.E.2d 171, 174 (1962):

> It is a well settled rule that the terms of an insurance policy must be construed most liberally in favor of the insured and where the words of a policy are ambiguous or where they are capable of two reasonable interpretations that construction will be adopted which is most favorable to the insured. However, in cases where there is no ambiguity, contracts of insurance, like other contracts, must be construed according to the terms which the parties have used, to be taken and understood in their plain, ordinary and popular sense. If the intention of the parties is clear, the Courts have no authority to change the contract in any particular. The Court has no power to interpolate into the agreement between the insurer and the insured a condition or stipulation not contemplated either by the law or by the contract between the parties. *Quinn v. State Farm Mut. Auto. Ins. Co.*, 238 S.C. 301, 120 S.E.2d 15 [(S.C. 1961);] *Rhame v. National Grange Mut. Ins. Co.*, 238 S.C. 539, 121 S.E.2d 94 [(S.C.1961)].
>
> The construction of a written contract presents a question of law for the Court only when the contract is clear, unambiguous and free from doubt. Where there is ambiguity, uncertainty or doubt as to proper

construction of the contract, intention of the parties becomes a question of fact for the jury to determine and for their aid resort will be had to extrinsic evidence to show the conditions surrounding the parties, the circumstances under which the contract was executed, as well as the negotiations between the parties leading up to the execution thereof. *Cooper & Griffin, Inc. v. Bridwell*, 177 S.C. 219, 181 S.E. 56 [(S.C. 1935)]; *Wheeler v. Globe & Rutgers Fire Ins. Co.*, 125 S.C. 320, 118 S.E. 609 [(S.C. 1923)]. In the Wheeler case, the Court employed this language:

> As a general rule, contracts are to be construed by the court; but where a contract is not clear, or is ambiguous and capable of one or more constructions, what the parties really intended, as a matter of fact, should be submitted to a jury.

[*Id.* at 610)].

### 1. Boilermaker Endorsements

The question before the Court is whether the Boilermaker Endorsements removed the damaged Legacy Equipment from coverage such that Insurers are not required to cover JWA's loss suffered on August 4, 2020.

The interpretation of an insurance policy is a legal issue under South Carolina law. *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 578 (S.C. 2009) (citing *State Farm Mut. Auto. Ins. Co. v. James*, 522 S.E.2d 345, 348-49 (S.C. Ct. App. 1999)). Whether a contract's language is ambiguous is a question of law. *S.C. Dep't of Nat. Res. v. Town of McClellanville,* 550 S.E.2d 299, 302-03 (S.C. 2001). A contract is ambiguous "only when it may fairly and reasonably be understood in more ways than one." *Hansen*, 565 S.E.2d at 117.

A patent ambiguity is one where the uncertainty as to meaning "arises upon the words of the will, deed, or other instrument as looked at in themselves, and before any attempt is made to apply them to the object which they describe." *Ward v. Dixie Nat. Life Ins. Co.*, 257 F. App'x 620, 626 (4th Cir. 2007). *See also Beaufort Cnty. Sch. Dist. v.*

*United Nat. Ins. Co.*, 709 S.E.2d 85, 95 (S.C. Ct. App. 2011). When the ambiguity is patent, South Carlina law requires the Court to resolve the ambiguity in favor of the insured. *See Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 321 (S.C. Ct. App. 1994), *writ granted in part on other grounds, decision aff'd*, 468 S.E.2d 304 (S.C. 1996); *Grayson v. Aetna Ins. Co.*, 308 F. Supp. 922, 926 (D.S.C. 1970); *Ward*, 257 F. App'x at 627.

Here, the words "deleting $60,000,00 in equipment;" "the following values are deleted . . . TIV removed: $60,000,000"; "deleting $60,000,00 in equipment" are patently unambiguous on their face. It is evident that, at the time this requested change was made and confirmed between the parties, neither JWA nor the Insurers had any premonition of the impending battle between them. Rather, the conflict becomes apparent "when attempting to apply the[se] words . . . to the object or subject described." *Beaufort Cnty. Sch. Dist.*, 709 S.E.2d at 95. In other words, when applied to developed or subsequently discovered facts surrounding the $60 million equipment value, the language may reasonably be interpreted in either of two ways: (1) as removing the damaged Legacy Equipment from coverage or (2) as removing $60 million in equipment value to account for the removal of the Mino-Hazelett Equipment from the SOV for the Legacy Building and other foundation-related value adjustments. Thus, this creates a latent ambiguity. *See id.* ("A latent ambiguity exists when there is no defect arising on the face of the instrument, but arising when attempting to apply the words of the instrument to the object or subject described.") "As is said in 2 C. J. 1314, speaking of a latent ambiguity: 'It does not appear on the face of the words used, nor is its existence known until these words

are brought in contact with collateral facts.'" *Hastings v. Union Fire Ins. Co*.,125 S.E. 923, 924 (1924).

Extrinsic evidence is admissible and may be considered in resolving a latent ambiguity. *E.g., Beaufort Cty. Sch. Dist.*, 709 S.E.2d at 95 (citing cases); *McWhite v. ACE Am. Ins. Co*., No. 4:07-CV-01551, 2010 WL 1027872, at *3 (D.S.C. Mar. 17, 2010) ("Where an insurance policy is ambiguous, then extrinsic evidence is admissible to explain its meaning."), *aff'd* 412 F. App'x. 584 (4th Cir. 2011). Accordingly, the Court may consider extrinsic evidence to see if there is any material dispute as to what was "contemplated by the parties" when contracting the Boilermaker Endorsements. *Isle of Palms*, 459 S.E.2d at 321.

As Insurers have moved for summary judgment on JWA's declaratory judgment and breach of contract claims, Insurers shoulder the burden of demonstrating that there is no genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323. JWA, as the party opposing the motion may not rest on mere allegations or denials but must support its assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[T]he court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Insurers maintain they are entitled to summary judgment on JWA's declaratory judgment and breach of contract claims because "[u]nder any reading, the Boilermaker Endorsements . . . removed the Legacy Equipment from coverage effective July 1, 2020." (ECF No. 118 at 21.) In their motion, Insurers do not argue that the Boilermaker Endorsements on their face unambiguously apply to remove the damaged Legacy Equipment from coverage effective July 1, 2020.[8] Rather, it appears Insurers recognize a latent ambiguity, as they immediately turn to and rely on extrinsic evidence they contend paints a "complete picture regarding the Legacy Equipment" and shows without question that the parties understood and agreed to remove the Legacy Equipment from coverage via the Boilermaker Endorsements. (*See id.* at 21-24.) Insurers then argue that if "the Boilermaker Endorsements are susceptible to more than one reasonable interpretation," the extrinsic evidence resolves any ambiguity in favor of its interpretation. (*Id.* at 24 (concluding that "the extrinsic evidence clearly shows that the $60 million removed from coverage was for the Legacy equipment").) Lastly, if the extrinsic evidence does not resolve all ambiguities, Insurers contend the Court should reform the Policies and add the following language to the Boilermaker Endorsements because "there exists a mutual mistake": "Specifically, the equipment listed in the Decommissioning List attached hereto as Appendix A is no longer included as covered property under the Policy." (*Id.* at 24-25.)

---

[8] Insurers do argue in their Reply that the Boilermaker Endorsements unambiguously "mean that $60 million in equipment is being "eliminated" from coverage." (ECF No. 143 at 11-12.) As set forth herein, while the Court agrees the pertinent language is patently unambiguous on its face, a latent ambiguity clearly exists. Moreover, given that the Boilermaker Endorsements unambiguously address equipment **values** between the two properties and not specific pieces of equipment, the Court does not agree with Insurers that JWA has failed to "offer[] an alternative reasonable explanation as the meaning of this language." (*Id.* at 12.)

On the other hand, JWA contends[9] that "[t]here is plenty of evidence from which a reasonable jury could conclude that JWA and Insurers did not intend to remove the Legacy Equipment from coverage." (ECF No. 131 at 21.) JWA argues that when all the evidence is considered in context, not just "incomplete pieces" provided by Insurers, a reasonable juror could find in favor of JWA's interpretation of the Boilermaker Endorsements – i.e., that the parties did not intend to remove the Legacy Equipment from coverage. (*Id.* at 21-28.)

The Court turns now to the extrinsic evidence presented by the parties. Insurers rely on the following in their motion to support their interpretation of the Boilermaker Endorsements: (1) representations made by JWA at the October 2019 meeting, including the presentation slide; (2) Ms. Grimes's June 15, 2020 emails; (3) underwriters' deposition testimony about the October 2019 meeting and/or the June 15, 2020 emails; (4) Ms. Grimes's deposition testimony; and (5) Mr. Brant's EUO testimony. (*See* ECF No. 118 at 21-24.)

Specifically, Insurers claim JWA represented at the October 2019 meeting that it planned to remove $60 million of "out of service" equipment from coverage when the Boilermaker went online in the second quarter of 2020 and that Ms. Grimes's emails to underwriters "coincided perfectly" with this information. (*Id.* at 22.) ACE's underwriter testified that at the October 2019 meeting, JWA represented that it was adding a boilermaker and taking equipment out of service. (*Id.* at 23; *see id.* at Ex. 27 at 109:20-

---

[9] JWA first argues that the Boilermaker Endorsements unambiguously do not remove the damaged Legacy Equipment from coverage and, thus, it is improper for the Court to consider parol evidence. (ECF No. 131 at 19.) However, as set forth above, the Court finds a latent ambiguity exists. Thus, the Court considers extrinsic evidence to determine if there is any material dispute as to what was "contemplated by the parties" when contracting the Boilermaker Endorsements.

111:3.) The underwriters for GSINDA and Westport testified that they believed the $60 million of equipment mentioned in the June 15, 2020, email was the same as or was explaining the $60 million out of service equipment or equipment JWA was getting rid of per JWA's representations at the October 2019 meeting. (*Id.* at 23; *see id.* at Ex. 26 at 86:13-88:21 & Ex. 15.) Ms. Grimes confirmed that the "$60 million referenced in her June 15, 2020, emails was 'the same referenced number from the [October 2019] underwriter meeting.'" (*Id.* (quoting *id.* at Ex. 4 at 38:14-17).) Further, Insurers argue that if any questions remained about which equipment was included in the $60 million, Mr. Brant's EUO testimony foreclosed any remaining doubt because Mr. Brant testified that "the out of service equipment value [on the slide] was obtained from the [April 2018] Decommissioning List," and he "confirmed that all the equipment damaged in the fire was included on the Decommissioning List." (*Id.* at 19; *see id.* at Ex. 25 at 19:21-21:11.) Accordingly, based on this evidence, Insurers argue that their interpretation of the Boilermaker Endorsements – removing the $60 million of Legacy Equipment – "clearly reflect[s] the understanding of all parties." (*Id.* at 24.)

In response, JWA argues that the above evidence does not show JWA intended to remove the Legacy Equipment from coverage but instead raises factual questions. (ECF No. 131 at 21-22.) As to the October 2019 meeting and presentation slide showing a $60 million reduction in equipment value, JWA's Director of Human Resources testified that this slide was not even shown during the meeting. (*Id.* at 22; *see id.* at Ex. 7 at 47:3-7.) JWA also notes the absence of this slide in the underwriting files, which the underwriters testified included all documents and information on which they based their underwriting decisions. (*Id; see id.* at Ex. 14 at 36:1-18 & Ex. 13 at 29:6-14, 111:4-7.) As

25

to the slide and Ms. Grimes's emails, JWA points out that neither document identified any specific equipment, and Ms. Grimes testified that she did not know which equipment was covered by the $60 million, and she did not intend to change the Policies from a blanket policy to one that removed a specific piece of property from coverage by her emails. (*See id.* at 22-23.)[10] As to the Decommissioning List from April 2018, JWA further points out that Mr. Brant testified that the $60 million of out-of-service equipment noted on the slide was referencing the damaged Legacy Equipment to be decommissioned if JWA moved forward with Phase II, which never happened. (ECF No. 131 at 24; *see id.* at Ex. 1 at 82:16-21; *see id.* at Ex. 3 at 13:21-14:11; 43:1-6.) Rather, it is undisputed that JWA continued to operate the Legacy Equipment up until the day of the loss. (*Id.*)

Also, in support of its interpretation of the Boilermaker Endorsements, JWA notes that JWA and Marsh witnesses testified that the $60 million equipment value reduced by the Boilermaker Endorsements represented the value of the Mino-Hazelett Equipment plus certain other value adjustments. (*Id.* at 25; *see id.* at Ex. 8 at 105:19-109:7 (testifying that the value of Mino-Hazelett Equipment had already been included in 2020 SOV and would need to be backed out "[s]o JW[A] would have been paying premium for an extra $47 million that they didn't need to."); *id.* at Ex.1 at 79:8-80:13 (same); *id.* at Ex. 1 at 82:22-84:16 (testifying that $60 million was $47 million of Mino-Hazelett Equipment plus

---

[10] (S*ee, e.g.,* ECF No. 131 at Ex. 8 at 71:25-72:17 ("Q: . . . If there was one piece of equipment worth $60 million and that was the equipment referenced by Stan Brant at the October 2019 underwriters meeting and referenced by you in your June 15th e-mail, then that piece of equipment was removed from coverage, correct? . . . A: No. 'Cause I never referenced a piece of equipment. Sorry. I don't understand. I never referenced a piece of equipment."); *id.* at Ex. 8 at 73:2-6 (testifying she did not know which equipment was covered by the $60 million value); *id* at Ex. 8 at 127:9-14 (testifying that JWA never told her to remove coverage for equipment the company still owned); *id.* at Ex. 8 at 130:10-13 ("Q: Did you interpret Phil's e-mail to be asking you to change the policy from a blanket policy to one that exempted specific pieces of property? A: No, not at all."); and *id.* at Ex. 8 at 150:1-16 ("I interpreted Chris's e-mail to be saying, Starr was saying there was no equipment coverage, that we had removed equipment coverage, and that was not the case.").)

$13 million of value for foundation work); *id*. at Ex. 6 at 30:10-24 (same). JWA emphasizes that even AIG acknowledged in its claim notes that "[JWA's] ***explanation on values remains consistent*** and that the pre-loss revised values in legacy reflected an increase for new equipment destined for boilermaker being stored in legacy." (*Id.* at 25 (emphasis in original) (quoting *id.* at Ex. 60).) JWA also argues that its intent not to take any specific equipment out of coverage is supported by the Policies themselves and Ms. Grimes's testimony regarding her understanding of the policies as it relates to removing specific pieces of equipment from coverage. (*Id.* at 25-26; *see id.* at Ex. 8 at 73:7-23 (testifying that "JW has what's called a blanket policy of insurance."); *id.* at Ex. 8 at 123:4-22 ("Q: And the blanket policy covers all property at a covered location, correct? A: Correct."); *id.* at Ex. 8 at 71:15-24 (testifying she never received a list of equipment to be covered or removed from coverage); *id.* at Ex. 8 at 95:13-23 (testifying "JWA had never provided equipment listing during submissions or during mid-term changes. . . . for JWA specifically there had never been a need or a request from carriers to itemize any equipment."); *id.* at Ex. 8 at 95:24-96:5 (testifying that "[i]f [JWA] had wanted to take a specific piece of equipment out, I probably would have asked them what that specific piece was, yes, as opposed to a bulk removal."); *id.* at Ex. 8 at 139:13-25 ("Q: In your career have you ever seen an endorsement that changed the nature of a policy from a blanket policy to a scheduled one? A: No. . . I don't know why a client would ever go to [a scheduled policy]."); *id.* at Ex. 8 at 140:1-24 (testifying that insureds "absolutely" prefer blanket policies over scheduled policies, would be "unusual" for an insured to change from blanket to scheduled policy and that "in 15 years I've never seen that").)

The question of the parties' intent is a factual issue usually left to the jury, *Beaufort Cty.*, 709 S.E.2d at 96, unless there is no genuine dispute as to the parties' intentions. *See McWhite v. ACE Am. Ins. Co., No. 4:07-CV-01551-RBH*, 2010 WL 1027872, at *3 (D.S.C. Mar. 17, 2010), *aff'd*, 412 F. App'x. 584 (4th Cir. 2011). Here, the record clearly contains conflicting testimony as to the parties' intent behind the $60 million equipment value adjustment to the Legacy Budling's SOV. Reviewing all the evidence in a fashion most favorable to JWA, as the Court must, the Court finds there is a genuine dispute of material fact as to whether the JWA intended to take the damaged Legacy Equipment out of coverage via the Boilermaker Endorsements. Accordingly, the Court finds the matter is inappropriate for disposition on summary judgment. *See Anderson*, 477 U.S. at 249 (stating that is not the court's place at this stage to "weigh the evidence and determine the truth of the matter"). For the foregoing reasons, Insurers' motion for summary judgment on JWA's causes of action for declaratory judgment and breach of contract is denied.

Additionally, for reasons just discussed, the Court finds that ACE, Westport, and GSINDA have failed to meet their burden, of clear and convincing evidence, to show reformation of the Policies on the ground of mutual mistake. "A mutual mistake is one where both parties intended a certain thing and by mistake in the drafting did not get what both parties intended." *Sims v. Tyler*, 281 S.E.2d 229, 230 (S.C. 1981). Here, these Insurers have failed to put forth clear and convincing evidence that the parties intended to take the damaged Legacy Equipment out of coverage, but by mistake in the drafting failed to utilize more specific language to effectuate their agreed-upon intent. Accordingly,

the Court grants JWA's motion for summary judgment on ACE, Westport, and GSINDA's counterclaim for reformation.

### 2. Molten Material Endorsement

The next question before the Court is whether the Policies' Molten Material Endorsement's $10 million sublimit applies to JWA's claim. Insurers filed a motion for summary judgment on this issue, arguing that, if JWA is entitled to coverage under the Policies, then the sublimit applies and JWA's recovery for its entire claim should be limited to $10 million. JWA filed a cross-motion for summary judgment on this damage limits issue, arguing that the sublimit does not apply to its claim.

The Molten Material Endorsement insures against, subject to a sublimit of $10 million per occurrence, "direct physical loss or damage cause[d] by heat from Molten Material, which has been accidently discharged from equipment." (ECF No. 115 at Ex. 5 at 65.) Contrary to Plaintiff's assertion,[11] the word "occurrence" is defined in the Policies as "any loss or series of losses arising out of one event." (*Id.* at Ex. 5 at 30.) Thus, an occurrence has three parts: (1) any loss or series of losses (2) arising out of (3) one event. Every occurrence, then, is attributable to one event of loss or series of losses.  However, the word "cause" is not defined in the Policies. (*See generally id.* at Ex. 5.) "Where a term is not defined in an insurance policy, it is to be defined according to the usual understanding of the term's significance to the ordinary person." *State Farm Fire & Cas. Co. v. Barrett*, 340 S.C. 1, 8 (Ct. App. 2000). The *American Heritage Dictionary* defines "cause" as "[t]he producer of an effect, result, or consequence" and the "person, event,

---

[11](*See* ECF No. 115 at 41.)

or condition, that is responsible for an action or result." *American Heritage Dictionary,* https://ahdictionary.com/word/search.html?q=cause (lasted visited December 8, 2023).

The Conditions section of the Policies, specifically Condition M, entitled "Limits and Sublimits of Liability," provides guidance on how sublimits work. Condition M states that "[t]his policy may contain Sublimits of Liability applicable to specific coverages, specific causes of loss, specific kinds of loss, or specific locations." (ECF No. 115 at Ex. 5 at 25.) Of particular import, given the sublimit at issue, the Policies specifically address sublimits applicable to a specific causes of loss: "The Sublimit of Liability . . . as applicable to a specific cause of loss **shall apply to all losses arising out of any one Occurrence**, **whether such losses include damage to real or personal property, Time Element loss (if such coverage is separately endorsed hereon), or both**." (*Id.* at Ex. 5 at 26.) (emphasis added.) Then, in the last paragraph of Condition M, the Policies specifically exclude from the Earth Movement and Flood Sublimits **only**, "**fire or explosion which occur as a direct result**." (*Id.*) (emphasis added.)

JWA makes three arguments in support of its position that the $10 million sublimit does not apply, but none is convincing.

JWA's first argument is that its claim cannot be limited to $10 million because it is entitled to recover, at a minimum, the actual amount of the loss pursuant to South Carolina's valued policy law. (ECF No. 115 at 36-37.) This statute states in relevant part:

> No insurer doing business in this State may issue a fire insurance policy for more than the value stated in the policy or the value of the property to be insured. The amount of insurance must be fixed by the insurer and insured at or before the time of issuing the policy. In case of total loss by fire the insured is entitled to recover the full amount of insurance. . . . This second does not apply to insurance on chattels or personal property.

S.C. Code 1976 § 38-75-20. "The valued policy law . . . was, no doubt, intended to relieve the insured from the burden of proving the value of his property after its total destruction, and to prevent insurance companies from receiving premiums on over-valuations, and, thereafter repudiating their contracts as soon as it becomes to their interest to do so." *Hunt v. Gen. Ins. Co. of Am.*, 87 S.E.2d 34, 37 (1955) (quoting *Mississippi Fire Ins. Co. v. Planters' Bank*, 138 Miss. 275, 103 So. 84 (1925)).

The main case relied upon by JWA in support of this argument is *Tedder v. Hartford Fire Ins. Co.*, 143 S.E.2d 122 (S.C. 1965). In this case, Hartford issued to plaintiff a policy of insurance under which plaintiff's home was insured against loss by fire in the agreed amount of $10,000.00. (*Id.*) Plaintiff's home was totally destroyed by fire, and the Court determined that "under the clear language of the statute, the plaintiff was entitled to recover the sum of $10,000.00, the amount of insurance which his policy admittedly provided." *Id.* at 123. Notably, in *Tedder* the court applied the statute to a homeowner's policy covering one piece of real property and to recover damages for the loss of only real property. Moreover, the statute's applicability was a no-brainer as the parties had agreed to a value of insurance at the time the policy was issued, as required by the plain language of the statute. *See* § 38-75-20.

Here, in stark contrast, Insurers issued all-risk Policies, up to policy limits of $250 million for any one occurrence,[12] which provides coverage for multiple properties owned by JWA in multiple states for physical loss and damage to not only real property, but personal property and business interruption, among other things. Furthermore, JWA and

---

[12] "An amount stated in the policy as the amount of the insurance or the maximum amount of recovery does not, in itself, constitute or make the policy a valued one, so as to entitle the insured to recover the specified amount in case of an actual or constructive total loss." 12 Couch on Insurance § 175:98.

the Insurers did not agree to a fixed amount of insurance at or before the time of issuing the Policies, as required by the statute. *See* § 38-75-20. Rather, JWA submitted to Insurers an SOV it prepared, which listed the total insured value at each of JWA's properties. (ECF No. 155 at 7.) The "SOVs were high-level, bare-bones spreadsheet listing the total values attributed to a handful of categories of property (i.e., a single value each for "Building," "Contents," "Equipment," and "Business Income" at each of JWA's locations)." (*Id.*) Notably, as explained by JWA, the SOVs were periodically updated, and they "did **not** operate as schedules of covered property, serve to take property in or out of coverage, **or define or limit coverage**." (*Id.*) (emphasis added.) Thus, unlike the homeowner's policy in *Tedder*, JWA's all-risk Policies providing coverage for the Legacy Building and Equipment are open, not valued policies. *See Sayer Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*, 150 F. Supp. 2d 907, 914 (S.D. W. Va.) (finding a similar all-risk policy to be an open policy of insurance and holding West Virginia's valued policy law inapplicable because, in part, the policies "provide no agreed-upon value in case of loss"). "Common sense and a straightforward reading of [JWA's] polic[ies] demonstrate that [two hundred and fifty] million dollars was never intended by the parties as liquidated damages on the total loss of the single [Legacy] building in [Goose Creek, South Carolina]." *Id.*

While the Court did not locate a South Carolina court applying South Carolina's valued policy law to an open insurance policy or to an all-risk policy covering two or more buildings, it predicts that the Supreme Court of South Carolina would not require the forced application of the valued policy law to what are clearly open, all-risk insurance policies. *See Sayer Bros.*, 150 F. Supp. 2d at 913 ("Where the highest state court has not ruled on a particular question, the district court must predict state law."). Such a

conclusion is further support by the undisputed fact that no amount of insurance was fixed by the parties at or before the time of issuing the Policies. Accordingly, the Court holds that South Carolina's valued policy law does not apply to JWA's Policies issued by Insurers and, therefore, does not entitled JWA to recover the actual amount of the loss.

JWA's second argument is that the $10 million sublimit does not apply because it contains no carve-out for fire losses to comply with Missouri Law, specifically Missouri's standard fire policy. (ECF No. 115 at 40-42.) However, as noted at the outset, South Carolina law, not Missouri law, governs the interpretation of the Policies with regard to the insured South Carolina property at issue in this case. (ECF No. 1 at ¶ 17.) The Court is not determining whether the Molten Material Endorsement can apply to JWA's property located in Missouri under Missouri law. The Court declines to invalidate a non-state specific endorsement based on Missouri law when the question before it is whether the Endorsement applies to property located in South Carolina under South Carolina law, and the application of the Endorsement is not violative of the laws of South Carolina.

Moreover, the Court notes that Condition M is not silent on resulting fires. It contains a carve-out, excepting from the Earth Movement and Flood Sublimits, a fire (or explosion) that occurs as a direct result of one of these perils. (*See* ECF No. 115 at Ex. 5 at 26.) However, as JWA is aware, there is no such similar language in the Policies regarding the Molten Material Sublimit and a resulting fire. The parties also specifically excluded resulting fire from another endorsement in the Policies – the Total Terrorism Exclusion Endorsement. (*Id.* at Ex. 5 at 83.) This Endorsement specifically provides:

>  . . . if an act of terrorism results in a fire and the direct physical loss or damage to property insured hereunder located in any State . . . that, either pursuant to the Standard Fire Policy or otherwise, prohibits exclusions for

> acts of terrorism that result in fire, this Company will pay for the loss or
> damage caused by that fire.

(*Id.*) Similar language could have been included in the Molten Material Endorsement or in Condition M with regard to this specific cause of loss, but it was not. Accordingly, the Court finds this argument without merit.

In its final argument, JWA attempts to distinguish between heat and fire, arguing that the plain language of the Endorsement allows claimants to distinguish between damage attributable to heat from molten metal and damage attributable to other causes, such as fire. (ECF No. 115 at 43-44.) Thus, JWA contends that the damage it suffered was not "cause[d] by heat" from the accidentally discharged molten metal; therefore, the Endorsement's $10 million sublimit does not apply to its claim. (*Id.* at 44.) Insurers argue that the Policies are clear that, if a specific cause of loss subject to a sublimit occurs, then all losses or series of losses arising out of that one occurrence are subject to the applicable sublimit. (ECF No. 133 at 41.) Thus, Insurers contend that the Endorsement's $10 million sublimit applies to JWA's losses sustained from the fire and fighting the fire because none of this damage would have occurred but for the accidental discharge of molten material. (*Id.* at 12, 41-43.)

JWA's claim was for fire damage – it sought money under its all-risk property insurance Policies for the losses it suffered to its Legacy Building and Equipment as a result of a fire. (ECF No. 1 at ¶ 1.) According to JWA, "[o]n August 4, 2020, **molten metal accidentally discharged from the Legacy Equipment caused a fire** in the Legacy Building, damaging the Legacy Equipment." (ECF No. 115 at 11) (emphasis added.) As more precisely concluded by JWA's excerpt, Jason Sutula, "**a fire initiation** due to heating of aluminum dust on structural members **due to molten aluminum splatter**,

34

which led to the ignition of the aluminum dust . . . **is the most probable cause of the fire**

event that occurred at JW Aluminum on August 4, 2020." (ECF No. 119 at Ex. 35 at 35)

(emphasis added.) Accordingly, the Court finds there is no material dispute in the record

that the fire was the consequence of the following specific cause: the accidental discharge

of molten material from equipment onto the ceiling's I-beam wherein the molten material

transferred enough heat to ignite the combustible aluminum dust on the I-beam. (*See*

ECF No. 115 at 11-12; ECF No. 119 at Ex. 35 at 44 ("Once aluminum splatter landed on

the dust and transferred enough heat to cause ignition, an uncontrolled pyrotechnic

reaction was initiated approximately 33 feet above the floor level."); ECF No. 133 at Ex.

R at 98:15-21 (JWA's other expert, Ben Nolan, testifying that "nothing came to my mind

other than the splash of aluminum up on the ceiling that caused this fire. So I believe by

reading through the facts, there were no other, that I could tell, independent or other

causes of that particular fire at that location").)

  Pursuant to the Policies' plain terms and conditions, the sublimit of liability – here,

the $10 million cap – "shall apply to all losses or series of losses arising out of any one

Occurrence, whether such losses include damage to real or personal property, Time

Element loss (if such coverage is separately endorsed hereon), or both."[13] (ECF No. 115

at Ex. 5 at 26.) Consequently, the Court finds that the $10 million sublimit applies because

the loss and series of losses sustained by JWA on August 4, 2020, arose out of and were

caused by one event: the accidental discharge of molten metal up on the ceiling's I-beam

---

[13] JWA also asserts that "Insurers failed to, at a minimum, articulate whether the sub-limit for damage caused by heat from molten material included fire resulting therefrom," (ECF No. 115 at 45-46), yet this quoted language from the Policies specifically provides that the Molten Material sublimit will apply to **all** resulting **losses and series of losses** caused by the event. (*Id.* at Ex. 5 at 26) (emphasis added.) This expansive language contained in the Policies' conditions governing sublimits – and specifically sublimits that are applicable to a specific cause of loss such as the Molten Material Endorsement – unambiguously curtails Insurers' liability for a subsequent fire loss.

causing a fire through the chemical reaction of the molten material's heat igniting combustible dust on the I-beam. While there is no dispute that the damage JWA suffered was directly caused by fire, falling debris, water, and frozen molten aluminum inside the equipment,[14] the Court does not agree that this Endorsement does not apply to these losses because the "heat from the specks of molten material that splattered on the I-beam caused negligible damage, and only to the I-beam and the discharged material itself." (*Id.* at 44.) While enticing, the Court finds this argument is an immaterial distinction given the Policies' unambiguous language governing sublimits. While JWA indisputably suffered damage from fire, falling debris, water, and frozen molten aluminum, these resulting losses fall within the Policies' conditions on sublimits, specifically the Molten Material sublimit. Because the "resulting *fire* loss in this case"[15] arose out of and was caused by the event, the Court finds that whatever damage JWA suffered from the fire, falling debris, water, and frozen molten aluminum is damage caused by heat from Molten Material accidentally discharged from equipment for purposes of the Policies' Molten Material sublimit.

South Carolina construction principles necessitate this conclusion. This Court's duty is "limited to the interpretation of the contract made by the parties themselves," *C.A.N. Enterprises, Inc. v. South Carolina Health & Human Servs. Fin. Com'n*, 373 S.E.2d 584, 587 (S.C. 1988), "regardless of its wisdom or folly, apparent unreasonableness, or failure to guard their rights carefully." *Gilstrap v. Culpepper*, 320 S.E.2d 445, 447 (S.C. 1984). Ultimately, it is the parties who have the "right to construct their own contract

---

[14] (ECF No. 115 at Ex. 58 at ClaimFiles_003066 (Jan. 5, 2021 adjuster report to Insurers describing the causes of damage).)

[15] (*Id.* at 44 (emphasis in original).)

without interference from courts to rewrite or torture the meaning of the policy to extend coverage." *Schulmeyer v. State Farm Fire & Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003); *see also South Carolina Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. Ct. App. 1990) (noting insurer obligations "cannot be enlarged by judicial construction"). Here, the relevant language in the Policies unambiguously provides that a sublimit applies to the specific cause of JWA's fire loss and series of losses sustained on August 4, 2020.[16] Any contrary conclusion would ignore the plain and unambiguous language of the Policies and result in an improper extension of Insurers' liability.[17] Therefore, if a jury determines the Legacy Equipment was not removed from coverage, then the Policies' Molten Material Endorsement would apply to JWA's claim, limiting JWA's recovery to a maximum $10 million combined for physical damages and business interruption losses.[18] Accordingly, the Court grants summary judgment in favor of Insurers on limiting coverage for JWA's entire claim to $10 million per the Molten Material Endorsement.

---

[16] For these reasons, the Court is not persuaded by JWA's reliance on *Acme Galvanizing Co. v. Fireman's Fund Ins. Co.*, 270 Cal. Rptr. 405 (Cal. Ct. App. 1990). (ECF No. 115 at 44-45.) That case dealt with an exclusion and the ensuing loss exception; whereas this case involves a sublimit endorsement and unambiguous language providing that all loss or series of losses arising out of the Occurrence will be subject to sublimits applicable to a specific cause of loss, except a fire caused by flood or earth movement.

[17] The Court is not persuaded by JWA's argument that "if Insurers had understood and intended the Molten Material Endorsement to apply so broadly, they would have raised its potential application immediately following the notice of loss." (ECF No. 115 at 49.) This argument ignores the fact that Insurers were conducting investigations after the loss and had requested information about the fire's cause, scope, and impact in its initial reservation of rights letter to JWA dated September 30, 2020. (*See id.* at Ex. 30.) Additionally, this letter stated that "Insurers do not waive or modify any of the terms, conditions, provisions, or limitations set forth in the Policies, whether or not referred herein"; "Additionally, other provisions may be found to be applicable after further investigation or analysis, and no waiver of any provisions, conditions, limitations or exclusions of the Policies is intended or implied by our citation of the above provisions." (*Id.* at Ex. 30 at 5.) After discussing this Endorsement internally and with Marsh in September and October 2020, respectively, Insurers raised its potential applicability directly to JWA on November 12, 2020. (*Id.* at Ex. 31 at 3 ("It is our understanding that the heat from molten material was the precipitating cause of the damage to the Insured's property.").) The Court finds that such conduct by Insurers does not support the inference that Insurers had no understanding or intent when drafting the Endorsement for it to apply to JWA's claim.

[18] (*See* ECF No. 115 at Ex. 5 at 26 and 30 ("The term Time Element means any and any loss due to the Interruption of the Insured's normal business operations, including, but not limited to, business interruption, extra expenses, loss of rental income, and other similar economic losses.").)

### 3. Actual Cash Value

Insurers also move for summary judgment in their favor on the issue of limiting coverage for JWA's equipment claim. Specifically, Insurers argue that, if JWA is entitled to coverage under the Policies, then JWA's equipment claim should be limited to the actual cash value of the equipment destroyed at the time of the loss. Insurers contend these damages are limited based on the following provision in the Policies:

**Y. Valuation**

Unless otherwise endorsed hereon, adjustment of loss under this policy shall be:
   . . .

7. on all other property covered by this policy, the cost to repair or replace the damaged property with materials of like kind, size, capacity and quality subject to:

. . .

b. in the event of direct physical loss or damage to property which is not repaired, rebuilt or replaced within two (2) years from the date of direct physical loss or damage, this Company shall not be liable for more than the actual cash value (with proper deduction for depreciation) of the property destroyed.

All of the above to be computed as of the time and at the place of the loss when, with due diligence and dispatch, rebuilding, repairing or replacement of the damaged or destroyed property could be effected.

(ECF No. 115 at Ex. 5 at 29) (hereinafter, the "Two-Year Provision"). Pursuant to the Two-Year Provision, Insurers argue that for JWA to receive payments for the damaged equipment beyond actual cash value, the actual repair, rebuild, or replacement of the equipment must be completed in two years. (ECF No. 118 at 27-28.) Insurers cite to *Hicklin v. State Farm Fire & Cas. Co.*, No. 5:17-CV-03463-SAL, 2020 WL 1244631 (D.S.C. Mar. 13, 2020), wherein the court looked to the conditions section of the policy

38

and relied on the following language – "[u]ntil actual repair or replacement is completed, we will pay only the actual cash value at the time of loss . . . . you must complete the actual repair or replacement . . . within two years after the date of the loss" – in finding State Farm was entitled to judgment as a matter of law on plaintiff's breach of contract claim. *Id.* at *4. Like the plaintiff in *Hicklin*, JWA does not dispute that the damaged equipment has not been repaired, rebuilt, or replaced within two years of August 4, 2020. (*See generally* ECF No. 131.)

Rather, JWA contends that Insurers rely on a clause buried in the Policies that does not, by its own terms, expressly condition payment on replacement within two years. (ECF No. 131 at 28-29.) JWA claims the Two-Year Provision is "radically different" than the language in *Hicklin.* (*Id.* at 30.)  JWA argues that it is ambiguous whether the clear intent of the Two-Year Provision was to impose a condition precedent on Insurers' obligation to pay repair/replacement costs. (*Id.* at 29.) Consequently, JWA claims this ambiguity must be resolved in its favor, or if not, the issue of how this provision should be interpreted is a question of fact for a jury to decide. (*Id.* at 30.)  JWA also notes that the Two-Year Provision is subject to an "important qualifier." (*Id.*) It argues that it could not effect repair or replacement because Insurers did not comply with their obligations under the Policies and intentionally delayed payment such that a reasonable jury could find JWA's failure to repair or replace the damaged equipment was excused by Insurers' conduct. (*Id.* at 30-32.)

On this last point raised by JWA, Insurers argue that the Court should not extend the period of interruption because there is no admissible evidence in the record that JWA "exercised extraordinary diligence" to rebuild or that JWA "did not have the financial

wherewithal to return the Legacy Building and Equipment to full operation in the absence of insurance." (ECF No. 147 at 31-32.) Rather, Insurers point out that JWA is a "sophisticated entity owned by four multi-billion-dollar institutional investment funds" and had "$50 million available in financing to fund Phase II." (*Id.* at 32 (relying on *id.* at Ex. 45 at 102:8-103:8,168:20-169:10).)

To resolve the first issue, the Court turns to the language of the Two-Year Provision. This Provision unambiguously provides that Insurers "shall not be liable for more than the actual cash value (with proper deduction for depreciation) of the property destroyed" "in the event of direct physical loss or damage to which is not repaired, rebuilt or replaced within two (2) years from the date of direct physical loss or damage." (ECF No. 115 at Ex. 5 at 29.)  In *Hicklin*, the policy stated, "[t]o receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the building within two years after the date of the loss . . . ." 2020 WL 1244631, at *4. While worded differently, the Court does not agree that the *Hicklin* provision is "radically different." Both policy provisions are unambiguous; it is just that, here, the Two-Year Provision indicates that, when X is not done, payment is limited to ACV, and the provision in *Hicklin* indicates that, to receive additional payments based on RCV, X must be done. The "X" is the same and the outcome speaks to how recovery may be limited depending on whether X occurs.

Moreover, the Two-Year Provision is not rendered ambiguous simply because it does not specify that repairs "must" be completed in two years. *See, e.g., Metanoia v. XL Ins. Am., Inc.*, No. 2:21-CV-01291-DCN, 2023 WL 317665, at *11-12 (D.S.C. Jan. 19, 2023) (rejecting plaintiff's contention that a two-year provision on ACV is ambiguous

because it did not specify that repairs must be completed in two years). In *Metanoia*, the builder's risk policy had a two-year provision that stated: "The lesser of the cost to repair or replace Permanent Works at the same site and within two (2) years from the date of damage . . . . Otherwise the loss shall be settled on an 'Actual Cash Value' basis." *Id.* at *11. As to this provision, the court concluded that "[a]lthough the provision is found in the valuation section, the provision speaks for itself and unambiguously provides that the loss may be settled using ACV if repairs were not made within two years." *Id.* at *12. While the Court in *Metanoia* examined and relied on other relevant language in the policy to draw its ultimate conclusion, its finding on this two-year provision supports the Court's holding that the Two-Year Provision in the Valuation section of the Policies clearly and unambiguously provides that JWA will be limited to recovery based on the ACV if the property has not been repaired, rebuilt, or replaced within two years. !

Having determined that the Two-Year Provision is unambiguous on its face, the Court turns to JWA's argument that "[h]ad Insurers complied with their obligations under the Polic[ies] and handled JWA's claim in good faith, [it] could have repaired or replaced the Legacy Equipment long ago." (ECF No. 131 at 30.) JWA asserts that Insurers dragged out the claims process and intentionally delayed and refused payments. (*Id.* at 30-31.) Thus, JWA argues that its compliance with the Two-Year Provision should be excused because Insurers' conduct prevented it from repairing or replacing its damaged property within two years of the loss. (*Id.*)

Under the so-called "prevention doctrine," a condition precedent to a contract is excused when the promisor prevents or hinders the occurrence of the condition, and the condition would have occurred in the absence of such prevention or hindrance. *See In*

*Re Peanut Crop Ins. Litig.*, 524 F.3d 458, 474 (4th Cir. 2008); *Champion v. Whaley*, 311 S.E.2d 404, 406 (1984). JWA essentially asserts that its ability to replace or rebuild the Legacy Equipment was never in play and had been waived by Insurers through their conduct – i.e., in breaching the contract and processing the claim in bad faith. (ECF No. 131 at 30-31.) *See Metanoia*, 2023 WL 317665, at *12 (addressing plaintiffs' argument that "it would be a risky investment of money to make repairs without certain knowledge that such repairs would be covered at their RCV" where insurer contested full coverage.) "While waiver is often applied when a plaintiff waives his or her right to enforce a contract, the principle can also apply where the insurer-defendant waives a provision that was written into the policy for the company's own benefit." *Id.* Regardless of the specific theory advanced – waiver, prevention, or repudiation – the underlying argument is the same: it is unequitable for an insurer to withhold payment of actual value, thus preventing the insured from replacing or repairing damaged property, and later denying replacement cost coverage because the insured did not comply with a replacement requirement.

The Court finds JWA in a "no win" situation: in order to recover under the replacement cost coverage it purchased, it would have to incur the cost of repairs and replacements when there is no guarantee that a future breach of contract action by it will be successful. As set forth above, there is a genuine dispute as to whether Insurers breached the contract by denying coverage. Given this holding, the Court that finds a jury could reasonably conclude that Insurers' conduct prevented JWA from replacing or repairing the damaged equipment within two years. Consequently, the Court holds there is a genuine dispute as to whether Insurers waived enforcement of or prevented compliance with the Two-Year Provision, such that JWA was excused from the

replacement condition. *See Parker v. Parker*, 443 S.E.2d 388, 391 (S.C. 1994) ("Waiver is a question of fact for the finder of fact.").[19]  "Even though the [C]ourt agrees that the terms of the Polic[ies] are clear enough, [JWA] will be permitted to assert that [it was] limited in [its] ability to adhere to the terms of the [Two-Year Provision]." *Metanoia*, 2023 WL 317665, *13. Therefore, the Court denies summary judgment in favor of Insurers based on the Two-Year Provision.

### B.  Bad Faith Claims against ACE & GSINDA

In its complaint, JWA asserts bad faith claims against ACE and GSINDA based on their processing / investigation of its claim and ultimate denial of coverage. ACE and GSINDA move for summary judgment in their favor on JWA's bad faith claims. Specifically, ACE and GSINDA contend they were objectively reasonable in their denial of coverage for the Legacy Equipment because the record is replete with evidence that JWA intended to remove this Equipment from coverage. (ECF No. 118 at 31-39.) Further, they argue that they timely investigated the claim; advised JWA of their coverage concerns in a reservation of rights letter and requested narrowly tailored information and documents on the SOV Issue; followed up on the SOV Issue because the pre-loss evidence did not support JWA's explanation; requested JWA sit for EUO, as JWA continued to deny it had responsive documents; and consistently communicated with JWA to obtain the information needed to resolve the claim. (*Id.*)

---

[19] While Insurers stated, on several occasions, in their communications to JWA during its investigation of the claim that they do not waive any provisions or limitations set forth in the Policy, the Court does not find such language dispositive of this issue. (*See e.g.*, ECF No. 131 at Ex. 40 (stating in their reservation of rights letter that "Insurers do not waive or modify any of the terms, conditions, provision, or limitations set forth in the Policies, whether or not referenced herein").) *See Metanoia*, 2023 WL 317665, *12 (finding that a reasonable factfinder could conclude that the no waiver language in coverage letters was "boilerplate legalese," particularly where insurer continued to contest insured was fully insured under the contract).

JWA, however, contends that ACE and GSINDA "ignored all evidence that the Legacy Equipment had not been removed and searched desperately for any shred of evidence that would allow them to refuse to pay the claim." (ECF No. 131 at 41.) JWA further argues that ACE and GSINDA "used the claims-handling process to support their predetermined decision to deny JWA's claim." (*Id.* at 40.)

The Court will address the denial of coverage claim followed by the claim-processing/investigation claim.[20] However, before turning to the merits, the Court finds it necessary given the parties' arguments (or lack thereof)[21] and the order of events in this case to first address which evidence the Court may consider in addressing JWA's bad faith claims.

In *Howard v. State Farm Mut. Auto. Ins. Co.*, 450 S.E.2d 582 (S.C. 1994), the Supreme Court of South Carolina held:

> Whether an insurance company is liable for bad faith must be judged by the evidence before it at the time it denied the claim or if the insurance company did not specifically deny the claim by the evidence it had before it at the time the suit was filed. *See Nationwide Mutual Insurance Co. v. Clay*, 525 So.2d 1339, 1342 (Ala.1987). Evidence that arises after the denial of the claim is not relevant to the propriety of the conduct of the insurer at the time of its

---

[20] JWA also contends that ACE and GSINDA's reliance on the Molten Material Endorsement was in bad faith. (ECF No. 131 at 46.) However, given the Court's holding that the Molten Material Endorsement applies to JWA's claim, the Court holds also that it was objectively reasonable for ACE and GSINDA to rely on this Endorsement to limit JWA's damages to $10 million. That said, it is undisputed that ACE and GSINDA did not make payments to JWA based on their respective shares of the $10 million sublimit at any time prior to their denial of the claim. (See ECF No. 115 at 16.) Consequently, while the jury shall not consider any evidence on whether this Endorsement applies to JWA's claim, if the jury determines the coverage issue in JWA's favor, then the jury may consider ACE and GSINDA's failure to pay their respective shares of the $10 million sublimit in determining whether ACE and GSINDA acted in bad faith.

[21] Insurers state that "by suing ACE and GSINDA for bad faith before providing all requested documents and appearing for an EUO, JWA has itself failed to comply with the Policies' terms and conditions." (ECF No. 118 at 38.) They state that "JWA failed to appear for the EUO until fifteen months after" it was first requested and after filing the instant lawsuit. (*Id.*) Insurers appear to raise this issue only to argue that such conduct by JWA supports a finding that any delay by Insurers in the investigation of the claim was due to JWA's own conduct, not their own. (*See id.*) Insurers do not specifically address the issue of what evidence may or may not be considered in their motion given this procedural posture – presumably because they contend all evidence is fair game. Nor do they address this issue in their reply, in response to JWA's argument discussed herein. (*See* ECF No. 143).

> refusal. Likewise, if the insurance company did not specifically deny the claim evidence that arises after the filing of the bad faith claim is not relevant.

*Id.* at 584. JWA appears to contend that *Howard* stands for a blanket prohibition on the use of post-litigation conduct as evidence in a bad faith claim where the suit is filed **_prior_** to the denial of the claim. (*See* ECF No. 131 at 40 n. 195.) [22] The Court does not read the *Howard* decision so broadly. The core of the *Howard* (and *Clay*[23]) decisions rested on the lack of relevance of post-litigation conduct as it applies to the original denial of an insured's claim when suit is filed **_after_** the denial of a claim. In fact, the *Howard* court specifically stated that if the incident giving rise to the bad faith claim is **not** a claim denial, then "evidence that arises after the filing of the bad-faith claim is not relevant." *Howard*, 450 S.E.2d at 584.

In the case at bar, Insurers seek to use testimony obtained at the EUO after JWA filed its bad faith claim to support their position that their denial of the claim was objectively reasonable and, thus, in good faith. (*See* ECF No. 118 at 36-37 (third argument).) After consideration, the Court finds that such evidence is relevant to whether Insurers' denial of coverage for the Legacy Equipment **_after_** the EUO was in bad faith. *Contra Jordan v. Allstate Ins. Co.*, No. 4:14-cv-03007-RBH, 2016 WL 4367080, at *7 (D.S.C. Aug. 16, 2016), *aff'd*, 678 F. App'x 171 (4th Cir. 2017) (holding that, under South Carolina law, evidence that was not available to Allstate at the time it denied the plaintiff's demand for

---

[22] While JWA relies on *Jordan v. Allstate Ins. Co.*, No. 4:14-cv-03007-RBH, 2016 WL 4367080 (D.S.C. Aug. 16, 2016), (*see* ECF 131 at 41 n. 195), the *Jordan* court is citing to *Howard*. *Id.* at *6. The *Jordan* court also only had cause to touch on the issue of evidence arising **_after_** the insurance company denied plaintiff's demand for coverage, stating that "[u]nder *Howard*," such evidence cannot be considered because it "obviously was not available to Allstate at the time it denied Plaintiff's demand" for coverage. *Id.* at *7.

[23] The insurer in *Clay* attempted to use conduct that occurred after the bad-faith denial of the claim to establish that it was not acting in bad-faith toward its insured. *Clay*, 525 So.2d at 1339. The *Clay* court held that evidence of an insurer's conduct after the incident which gave rise to the bad-faith claim was irrelevant to that claim. *Id.* at 1342.

coverage was irrelevant). Accordingly, the Court holds that it may consider evidence Insurers had before them after JWA filed suit but before they denied the claim in analyzing JWA's claim that ACE and GSINDA's denial of coverage was in bad faith.

### 1. Denial of Claim

A party claiming bad faith denial of coverage must demonstrate:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.*, 466 S.E.2d 727, 730 (S.C. 1996). "[T]he insured must prove that the insurer had no reasonable basis to deny coverage." *Ball v. USAA Life Ins. Co.*, No. 2:16-CV-00041-DCN, 2017 WL 4119659, at *14 (D.S.C. Sept. 18, 2017). *See Cock-N-Bull*, 466 S.E.2d at 730. "Thus, if the insurer was at least reasonable in concluding that the insured's claim should be denied, the insured's bad faith claim cannot survive." *Ball*, 2017 WL 4119659, at * 4.

ACE and GSINDA argue that their denial of coverage for the Legacy Equipment was reasonable. (ECF No. 118 at 36-37.) Relying on their conduct (discussed below) to support their good faith investigation of the claim, ACE and GSINDA state that they had to get an answer on the SOV Issue to determine if there was coverage. (*Id.*) They note that their underwriters advised that the $60 million value removed from coverage was for the Legacy Equipment and, thus, they communicated with JWA via a reservation for rights letter to relay their coverage concerns and seek clarification. (*Id.*) But, they contend JWA denied having any responsive information and documents; provided an explanation unsupported by any pre-loss evidence; delayed in providing documents; and then refused to sit for the EUO, instead filing the instant lawsuit. (*Id.* at 36-37.) They argue that,

"[f]inally, approximately fifteen months after the Loss," it was confirmed during the EUO "that the same equipment that was damaged in the Loss had been removed from coverage prior to the Loss," and therefore, their coverage denial was objectively reasonable. (*Id.* at 37.)

On the other hand, JWA argues that there is ample evidence from which a jury could conclude that ACE and GSINDA's denial of the claim was in bad faith. (ECF No. 131 at 45.) JWA argues that Insurers' theory that it removed the Legacy Equipment from coverage "makes no logical sense" as it was still operating the equipment; "is completely contrary to the Polic[ies'] blanket coverage scheme"; "is not supported by the June Emails"; and "contradicts the plain text of the $60 Million [Boilermaker] Endorsements" and testimony of "every JWA and Marsh witness." (*Id.* at 45.) As to the EUO testimony so heavily relied upon by Insurers, JWA claims it "does nothing of the sort,"; rather, "Mr. Brant simply recites facts Insurers had known since within hours of the fire" – that the damaged equipment was the Legacy Equipment. (*Id.* at 44.)

The present dispute relates to the third requirement set forth above that the insurer's refusal to pay must be unreasonable or in bad faith to support a claim for relief. Here, ACE and GSINDA have submitted evidence suggesting their refusal to pay JWA's claim was reasonable and in good faith. However, JWA disputes that the evidence conclusively establishes that their conduct was reasonable and in good faith. For the reasons discussed *supra* in section V.A.1., it is not especially obvious that Insurers' right to deny coverage was unreasonable in this case. When conflicting evidence is presented, summary judgment on the issue of bad faith is generally inappropriate. *See Foster v. Tandy Corp.,* 828 F.2d 1052, 1055 (4th Cir. 1987). Other South Carolina courts facing a

dispute over the reasonableness of an insurer's refusal to pay benefits have submitted the issue of reasonableness to a jury for determination. *See, e.g., Varnadore v. Nationwide Mut. Ins. Co.*, 345 S.E.2d 711, 713-14 (1986) (finding insurer not entitled to directed verdict although insurer argued that its own investigation showed a reasonable basis to deny the claim, court noted that allowing directed verdict would "bind ... insured to the findings and conclusions of the insurer's own independent investigation ... effectually insulate the insurer from liability ... and ... foreclos[e] a jury's consideration of the insured's evidence of bad faith."); *Howard*, 450 S.E.2d at 451-52 (explaining that trial judge did not err in submitting question of whether insurance company's refusal to pay benefits was unreasonable to a jury); *Lawson v. Nationwide Mut. Fire Ins. Co.*, No. 4:09-cv-1291-TLW, 2010 WL 1791283, at *2 (D.S.C. May 3, 2010) (denying summary judgment in plaintiff's favor because dispute regarding the reasonableness of Nationwide's denial of coverage must be resolved by the finder-of-fact); *E. Bridge Lofts Prop. Owners Ass'n, Inc. v. Crum & Forster Spec. Ins. Co.*, No. 2:14-CV-2567-RMG, 2015 WL 12831693, at *11 (D.S.C. Nov. 2, 2015), *on reconsideration in part*, No. 2:14-CV-2567-RMG, 2015 WL 12831694 (D.S.C. Dec. 22, 2015) (holding that "[w]hether Defendant's decision to deny coverage was reasonable is ultimately a question of fact for the jury" and denying both parties' motions for summary judgment). Accordingly, the dispute regarding the reasonableness of ACE and GSINDA's denial of coverage must be resolved by the finder-of-fact. For this reason, the Court denies ACE and GSINDA's motion for summary judgment on JWA's bad faith claim based on their denial of the claim.

## 2. Processing / Investigation of Claim

ACE and GSINDA also argue that they acted in good faith throughout the entire claims process and investigation into JWA's claim. (ECF No. 118 at 39.) Specifically, they highlight the following: their investigation started within days of the Loss; they issued a reservation of rights on September 30, 2020, raising the $60 million dollar question and requesting narrowly tailored information and documents on same; after receiving none and a "double counting" explanation not supported by any pre-loss evidence, they continued to seek an answer to their question and were "consistently communicating with JWA"; they requested an EUO in accordance with the Policies; and they continued to push for an EUO after a review of a "document dump" from JWA returned no helpful documents. (*Id.* at 34-36.) As to JWA's allegations of delayed payment, ACE and GSINDA contend payment was made by the end of December 2020. (*Id.* at 36.)

JWA largely disputes the facts as set forth by ACE and GSINDA above. JWA contends the communication between the parties "illustrates the rigged game that was the investigation." (ECF No. 131 at 41.) It claims ACE and GSINDA repeatedly pushed to obtain excessive amounts of documents and information after JWA had stated multiple times that such information and documents do not exist. (*Id. See id.* at 42 ("For months, Bad Faith Insurers devoted their investigation to determining what equipment had been "scrapped," despite JWA and Marsh providing evidence that no equipment was scrapped.").) JWA argues the investigation was intended to harass JWA and "bore little relation to the fact of JWA's loss." (*Id.* at 42. (asserting that Insurers "searched high and low for any evidence" to deny coverage).)  As to the EUO request, JWA argues "even Insurers knew the EUO request was in bad faith and served no purpose in the

investigation." (*Id.* at 43. (relying on emails sent by AIG personnel in December 2020 stating that, "[t]he balance of the market's strategy is to have the EUO demand out there before JWA decides to sue. Therefore, they are not going to tip their hat before [officially demanding the EUO].").) (*Id.*) Lastly, JWA asserts that ACE and GSINDA failed to advance funds requested and to timely pay the $1 million advance towards the building damage. (*Id.* at 46-47.)

Under South Carolina law, "[a]n insurer has a good faith duty to investigate a claim." *Flynn v. Nationwide Mut. Ins. Co.*, 315 S.E.2d 817, 820 (S.C. Ct. App. 1984). "Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim." 16A Appleman, Insurance Law and Practice Compensatory and Punitive Damages § 8878.25 (1981). "[T]he covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed." *Mixson, Inc. v. Am. Loyalty Ins. Co.*, 562 S.E.2d at 662 (citing *Tadlock Painting Co. v. Maryland Cas. Co.*, 473 S.E.2d 52 (1996)). "[I]f an insured can demonstrate bad faith or unreasonable action by the insurer *in processing a claim* under their mutually binding insurance contract, he can recover consequential damages in a tort action*." Tadlock*, 473 S.E.2d at 53 (quoting *Nichols v. State Farm Mut. Auto. Ins. Co.*, 306 S.E.2d 616, 619 (S.C. 1996)) (emphasis in original). Thus, breach of an express contractual provision is not a prerequisite to bringing a bad faith cause of action. *Tadlock*, 473 S.E.2d at 54. "Under South Carolina law, an insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." *Cock-N-Bull*, 466 S.E.2d at 730.

Again, the parties have presented conflicting evidence as to the reasonableness of ACE and GSINDA's respective claim processing and investigations. For example, reasonable minds could disagree as to whether ACE and GSINDA responded reasonably to JWA's explanation on the SOV Issue and acted reasonably in pressing the SOV Issue and demanding an EUO. These matters are better resolved by a jury. *See, e.g., E. Bridge Lofts Prop. Owners Ass'n*, 2015 WL 12831693, at *13 (finding "that it is a question of fact as to whether Defendant acted unreasonably when handling Creekstone SC's claim for coverage"*); State Farm & Cas. Co. v. Barton*, 897 F.2d 729, 731-732 (4th Cir. 1990) (stating jury could have inferred from the evidence presented by the insured that "State Farm deliberately set out to deny Barton's claim and that its investigation was designed to supports its denial, rather than to determine the truth"); *Mixson*, 562 S.E.2d at 662 ("An insurer is not insulated from liability for bad faith merely because there is no clear precedent resolving a coverage issue raised under the particular facts of the case.") *See also* 14 Couch on Ins. § 204:43 ("Bad faith ... is generally left as a question of fact for the jury."). Accordingly, the Court also denies ACE and GSINDA's motion for summary judgment on JWA's bad faith claim based on their processing and investigation of its claim.

### 3.  JWA's Bad Faith Expert

Having denying Insurers' motion for summary judgment on JWA's bad faith claims against ACE and GSINDA, the Court next addresses ACE and GSINDA's motion to exclude or limit the testimony of Michael Quinn, JWA's bad faith expert. (ECF No 113.)

The introduction and admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party offering the expert witness testimony bears the burden of demonstrating "its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

The Supreme Court has recognized that, under Rule 702, trial judges serve as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This "basic gatekeeping obligation" identified in *Daubert*, and now embraced by Rule 702, applies to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The gatekeeping obligation, like other determinations of the admissibility of evidence, requires the trial judge to exercise an informed and broad discretion, "guided by the overarching criteria of relevance and reliability." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Although the trial court is granted broad discretion, *see Cooper*, 259 F.3d at 199, the rejection of proposed expert witness testimony is the exception rather than the rule, *see SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 634–35 (E.D.N.C. 2013) (citing Fed. R. Evid. 702 advisory committee's note (2000)); *see also United States v. Crisp*, 324 F.3d 261, 269-70 (4th Cir. 2003) ("The Supreme

Court emphasized in *Daubert* that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596)).

JWA has proffered Michael Quinn as an expert witness on claims-handling industry standards and what constitutes bad faith. (*See* ECF No. 113 at Ex. 1.) Insurers object to Mr. Quinn's testimony on several grounds under Rule 702 and argue that his proffered testimony would confuse the jury and would be prejudicial to Insurers under Rule 403. (ECF No. 113 at 2.) Thus, Insurers ask the Court to exclude Mr. Quinn from testifying at trial. (*Id*. at 1.)[24]

The **first** section of Insurers' motion focuses on several opinions proffered by Mr. Quinn, which Insurers contend are unreliable as nothing more than legal conclusions given under the guise of "expert" opinions. (*See id.* at 4-16.) Insurers home in on 14 opinions of Mr. Quinn, which they contend are made without any factual or legal support. (*See* ECF No 113 at 5-14.) Insurers contend these "opinions" are merely "aspirational principles" and argue they should be excluded because Mr. Quinn admits he does not yet have any factual support reflecting any breach by the Insurers.  (*Id.* at 14.)

Expert witnesses are not "allowed to testify on legal conclusions or in terms that have legal import which would not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Wright v. UNUM Life Ins. Co*., No. 2:99-2394-23, 2001 WL 34907077, at *10 (D.S.C. Aug. 31, 2001) (quoting Fed. R. Evid. 702). However, "in some circumstances, opinion testimony that arguably states a legal conclusion is helpful to the jury, and thus, admissible." Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2001)

---

[24] While captioned as a motion "to exclude and/or limit the testimony," it appears Insurers are asking the Court to exclude Mr. Quinn from testifying at trial, period. (ECF No. 113 at 1.)

("For example, the testimony may be helpful if the case involves a specialized industry such as insurance.") Further, "'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" *Wright*, 2011 WL 34907077, at * 10 (quoting Fed. R. Evid. 704(a)). The task of distinguishing opinion testimony that embraces an ultimate issue of fact from opinion testimony that states a legal conclusion "is not an easy one." *U.S. v. Barile*, 286 F. App'x 749, 760 (4th Cir. 2002).

Upon review, the Court does not find that these 14 opinions are legal conclusions, as Mr. Quinn is not applying the law to the facts but rather is providing opinions as to insurance industry standards that underlie claims-handling in general. Therefore, the Court will allow Mr. Quinn to testify about "insurance industry standards and general examples of practices in conformance with industry custom." *Bullock v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2004 WL 5504973, at *1 (D.S.C. Dec. 9, 2004).

The **second** section of Insurers' motion attacks what it contends is Mr. Quinn's legal conclusion that bad faith is established by Insurers' refusal to pay for JWA's losses because the Molten Material Endorsement is inapplicable to JWA's claim. (ECF No. 113 at 16-18.) The Court agrees such testimony should be excluded, (*see* Quinn Report, lines 407-416), as Mr. Quinn is interpreting the Policy and testifying on an ultimate legal issue – whether the Molten Material Endorsement applies to JWA's claim – and then drawing another a legal conclusion from his conclusion on a legal issue – that Insurers acted in bad faith. *See, e.g., Donnert v. Feld Ent., Inc.*, No. 1:13-cv-40, 2013 WL 12097618, at * 2-3 (E.D. Va. No. 8, 2013) (excluding expert testimony regarding expert's opinion on the interpretation on what the lease provision meant and what actions would constitute

compliance with that provision); *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987) (finding contract interpretation is a question of law). It is well established that such conduct is within the province of this Court, (*see supra* section V.A.2), and/or the jury. S*ee supra* text accompanying note 18.

The **third** section of Insurers' motion seeks to exclude as unreliable and conclusory Mr. Quinn's opinions that Insurers acted in bad faith by not making payments based on two Business Interruption claims. (ECF No. 113 at 18-22.) Specifically, Insurers raise concerns with (1) his opinion on JWA's alleged inability to sell as cast aluminum to third parties, and (2) his opinion that JWA was entitled to a business income loss claim for sales JWA could not complete due to the damage to its equipment. (*Id.*) As to the first opinion, Insurers note that Mr. Quinn admits he did not attempt to validate the ability of JWA to make these sales and his basis of support that this *could* have occurred was *only* based on the assertions of JWA's counsel. (*Id.* at 19 (emphasis in original).) As to the second opinion, Insurers note that Mr. Quinn admits he has not completed his analysis to determine the merits of whether a bad faith claim exists for the inability of JWA to sell aluminum from the damaged machinery. (*Id.* at 21.) As such, they contend such opinions offered to the jury would be conjecture, speculative, and unreliable. (*Id*. at 19-21.) Thus, Insurers contend there is no factual support or completed opinion analysis for these opinions. (*Id.*)  Upon close review, the Court was unable to discern any specific response in JWA's response in opposition to Insurers' arguments on these two opinions. (*See generally* ECF 128.)

In reviewing what Mr. Quinn wrote at lines 448-460, it appears to the Court that he is providing his opinion on the Insurers' investigation into JWA's request for payments for

business interruption losses. The Court will allow Mr. Quinn to testify about industry standard practices in addressing a business interruption claim and apply those practices to the facts of the case and testify as to his opinion on the reasonableness of Insurers' conduct in this regard. *See Cock-N-Bull,* 466 S.E.2d at 730-31 (finding no error where trial court allowed expert to testify that the "insurance company handled the claim [not] very well" because this statement is not a legal conclusion, but an opinion on how well the company handled the claim); *Shields v. South Carolina Dep't Highways & Pub. Transp.,* 303 S.C. 439, 401 S.E.2d 185 (Ct. App.), *cert. denied,* (1991) (finding expert witness's statement that Highway Department's placement of signs "border[ed] on criminal negligence" was not a comment on the law). Given this specialized industry, the Court finds such testimony will help the jury understand the practices of claims adjusters when faced with this type of claim. *See Donnelly v. Linden Cap. Partners III, L.P.*, No. 2:20-CV-3719-RMG, 2022 WL 2314611, at *6 (D.S.C. June 28, 2022) ("The Fourth Circuit has held that an expert's testimony on whether a party acted reasonably is 'precisely the type of expert testimony that could assist the trier of fact in its determination.'") (quoting *Barile*, 286 F.3d at 761). !

In the **fourth** section of Insurers' motion, Insurers argue that Mr. Quinn's opinion on coverage analysis is unreliable and conclusory. (ECF No. 113 at 22.) The Court disagrees. In this portion of Mr. Quinn's report, he is generally discussing what he would expect to see in a claim adjuster's files when there is a coverage dispute and opining that, here, Insurers did not reasonably analyze the coverage issues. The Fourth Circuit has determined that an expert may express an opinion on whether a party acted reasonably – here, whether Insurers acted reasonably in making their coverage determinations. *See*

*Donnelly*, 2022 WL 2314611, at *6 (finding that "[expert]'s opinion concerning whether Linden reasonably determined that Plaintiff was not entitled to certain transaction fees does not state a legal conclusion and is not excludable").

The **fifth** section of Insurers' motion addresses Mr. Quinn's opinions on the reasonableness of Insurers' reliance on mutual mistake. (ECF No. 113 at 24.) Given the Court's ruling on Insurers' counterclaim for reformation (*see supra* Section V.A.1), the Court believes this issue is moot. However, even if not mooted by the Court's ruling, the Court finds the opinion expressed at lines 502-509 to be nothing more than a legal conclusion as Mr. Quinn is testifying as to what he believes is the legal definition of "mutual mistake." *See United States v. Offill*, 666 F. 3d 168, 175 (4th Cir. 1993) ("It does not help the jury for an expert to give testimony that states a legal standard.") Such an opinion is properly excluded, as the Court will charge the jury on the relevant law.

In the **sixth** section of Insurers' motion, Insurers contend all the forementioned bad faith claim opinions of Mr. Quinn should be excluded because they are insufficiently grounded on inadequate facts and data. (ECF No. 113 at 25-28.) Specifically, Insurers claim JWA made the intentional decision to limit Mr. Quinn's exposure and access to relevant witnesses and documents and that, because Mr. Quinn did not have "all relevant data to consider and evaluate," his opinions should be excluded. (*Id.* at 28.)

In response, JWA argues that Insurers fundamentally misunderstand Rule 702. (ECF No. 128 at 20.) To wit, they state that "[t]he 'facts or data' referenced in subsection (b) of Rule 702 is not the same as 'the facts of the case' in subsection (d)." (*Id.*) Rather, JWA contends, "the 'facts and data' of subsection (b) refer to the information supporting Mr. Quinn's testimony **_on the insurance industry standards applicable to insurers._**"

(*Id.*) (emphasis in original). Accordingly, JWA states that Mr. Quinn's testimony is "amply supported by reference to South Carolina statutes and general principles of insurance law." (*Id.*)

Rule 702 requires courts "to verify that expert testimony is 'based on sufficient facts or data.'" *E.E.O.C. v. Freeman*, 778 F.3d 463, 472 (4th Cir.2015) (quoting Fed. R. Evid. 702(b)). Thus, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Id.* The court may exclude an opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id.*

Here, Mr. Quinn states in his report that he reviewed the list of numerous documents attached to his report, (*see* ECF No. 128 at Ex. B at 148-155), to include the following types of documents:

> claim documents "filed" by the insured, as well as replies and other communique 64 by insurers and their counsel and/or agents; the claim files of the insurers; the claim files of non-insurers participating in the adjustment process (AIG claims 67 and Sedgwick); some of the documents on the DISCO (system); correspondence amongst the participating entities; correspondence among attorneys of various parties; photographs of the episode site(s); pleadings of parties; briefs of parties; mediation statements; South Carolina statutes; and legal opinions in cases.

(ECF No. 128 at Ex. 1 at 5.) Mr. Quinn also provides in his report a multi-paragraphed summary of the facts known to him and relied upon by him in arriving at his opinions. (*Id.* at Ex. 1 at 5-9.) Accordingly, the Court finds that Mr. Quinn's report sufficiently identifies the data and facts upon which his opinions are based. Fed. R. Evid. 702(b).[25] *See SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 590 (E.D.N.C. 2015), *aff'd*,

---

[25] Given the issue addressed next, Mr. Quinn obviously was not able to review and rely on all the deposition testimony ultimately taken in this case in formulating his initial report.

874 F.3d 370 (4th Cir. 2017) (stating that "even if the complete universe of evidence could have impacted [the expert]'s opinion, the court cannot substitute its judgment for that of the expert as to what is sufficient evidence to inform his experiential conclusion"; "the court only can review holistically the data relied upon by the expert and determine whether it is so incomplete as to render his methodology unreliable"; "it is not the court's place to close the gate" based on the contention that the expert should have looked at a larger universe of data"; any failure to consider additional evidence . . . must be the subject of cross examination").

**Lastly,** throughout their motion Insurers contend that any attempt by Mr. Quinn now—after the passage of the expert disclosure deadline and his presentation for deposition on his disclosed opinions—to amend his opinion disclosures based on depositions taken post-disclosure by JWA's counsel, should not be permitted. (*See generally* ECF No. 113.) Insurers address this argument more head-on in their reply, (*see* ECF No. 141 at 9- 13), because JWA attached Mr. Quinn's supplement report to its response in opposition filed on May 8, 2023. (*See* ECF No. 128, at Ex. 2.) Insurers contend Mr. Quinn's supplemental report should be excluded because it "adds entirely new theories and conclusions" and would prejudice Insurers. (ECF No. 141 at 9-13.) While silent in their reply, the Court assumes Insurers are making such an argument under Rules 26 and 37 of the Federal Rules of Civil Procedure.

JWA contends that Insurers' insistence on taking Mr. Quinn's deposition before their own and their failure to offer dates for depositions of their own witnesses outside of the last week before the end of discovery should not be held against Mr. Quinn nor limit his ability to testify to his opinions in his supplemental report. (ECF No. 128 at 19.) JWA

states that Mr. Quinn prepared a supplemental report because of the late depositions of Insurers' Rule 30(b)(6) witnesses, "which obviously impact Mr. Quinn's opinion on the claims-handing process." (*Id.*) JWA does not cite any case law supporting supplementation on this ground in its response. However, in a footnote, JWA argues that such supplementation is compelled by Rule 26(e): "JWA is simply fulfilling its duty to supplement Mr. Quinn's report given the new information obtained in discovery since Mr. Quinn's report and deposition, which informs Mr. Quinn's opinions." (*Id.* at 19 n. 18.) JWA does not affirmatively address the issue of prejudice to Insurers.

In their reply, Insurers take offense to JWA's contention that they are at fault for the order in which discovery occurred, and they outline in great detail the communications between the parties regarding discovery and the relevant deadlines imposed at the time. (*See* ECF No. 141 at 10-11.) In sum, they contend JWA is to blame for why fact witness depositions took place after the expert report deadline. (*Id.* at 11.)

<u>Supplemental Report</u>

Rule 26(e)(1) requires supplementation when a "party learns that in some material respect the information disclosed is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). Courts within the Fourth Circuit have held that Rule 26(e) permits supplemental reports only to "correct inadvertent errors or omissions." *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 630 (W.D.N.C. 2008). For instance, in *Akeva L.L.C. v. Mizuno Corp.*, the court reasoned that "to construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation." 212 F.R.D. 306, 310 (M.D.N.C. 2002). Similarly, in *Disney Enterprises, Inc. v. Kappos*, the court granted a motion in limine to

preclude an expert from testifying about an opinion provided in a supplemental report because the analysis therein "could have and should have been made" in the original expert report. 923 F. Supp. 2d 788, 795–96 (E.D. Va. 2013).

JWA argues that Mr. Quinn's May 3, 2023, report was a "supplemental report" that was provided pursuant to Rule 26. (ECF No. 128 at 19 n. 18.) JWA does not argue the original report was incomplete or incorrect such that it needed supplementing; rather, JWA argues that Mr. Quinn needed to supplement his report "to integrate discovery obtained after the issuance of his original report." (*Id.* at 19.) Indeed, a review of his supplemental report indicates that Mr. Quinn ***added*** two new conclusions – one regarding underwriting guidelines and one regarding limiting damages to actual cash value versus replacement value – based on such discovery. (ECF No. 128 at Ex. 2 at 22-23, 26.) JWA does not provide any case law to support that supplementation pursuant to Rule 26(e)(1) on this ground is proper. More importantly, the Court finds case law indicating that it is not. *See, e.g., Barnett v. United States*, No. 2:20-CV-02517-DCN, 2021 WL 5888542, at *3 (D.S.C. Dec. 13, 2021) (refusing to allow supplementation under Rule 26 on this ground because "to accept this expansive interpretation of 'supplementation' would lead to the type of impermissible bolstering of expert opinions that was rejected by the *Akeva* and *Disney Enterprises* courts," and noting that "the proper recourse would have been to seek a modification of the scheduling order").[26]

---

[26] *Compare Carpenter v. Trammel*, 2019 WL 2088425, at *3 (W.D.N.C. May 13, 2019) (rejecting a supplemental expert report in part because the plaintiff failed to "seek another extension of the expert report deadline" so that the expert could have access to the purportedly necessary records), *with Hartford Life Ins. Co. v. Montgomery*, 2014 WL 12609459 (D.S.C. Sept. 11, 2014) (permitting an untimely expert report to stand based on a finding of good cause under Rule 16(b)(4), allowing for amendments to a scheduling order).

The purpose of Rule 26(a) is to allow litigants "to adequately prepare their cases for trial and to avoid unfair surprise." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Accordingly, a party who fails to comply with the expert witness disclosure rules is prohibited from "us[ing] that information or witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). District courts are accorded "broad discretion" in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). In making this determination, district courts are guided by the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States*, 318 F.3d at 597. The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception. *Id.*

Here, the Court agrees with Insurers that allowing Mr. Quinn to testify about the two new opinions – at Conclusions 3 and 8 of his supplemental report – would unfairly prejudice them. Given that there is no dispute that the opinions are new, there can be no question that they present a "surprise" to Insurers. Thus, the first factor weighs firmly against finding the untimely disclosure harmless.

As to the second and third factor, Insurers highlight their efforts to amend the scheduling order and JWA's unwillingness to do so and contend that, while they could

have deposed Mr. Quinn again, doing so would have drawn "time and resources away from critical trial preparation tasks." (ECF No. 141 at 12.) Pursuant to the scheduling order at the time, the case was subject to being called for jury selection and/or trial the later of 60 days after dispositive motions have been resolved or May 9, 2023. (ECF No. 97.) Moreover, the supplemental report was disclosed after the expert disclosure deadline in the scheduling order and one month after the parties' dispositive motions were filed. As such, the Court finds factors two and three weigh against JWA. As to the fourth factor, the Court finds that Mr. Quinn's testimony as to the Two-Year Provision is important evidence.

The Court finds the final factor also weighs against JWA. As courts in this district have noted, an unfounded argument that an expert's "subsequent reports constituted supplemental reports as envisioned by Rule 26(e)(1) . . . . is not very strong" and can be grounds alone for the court's "hesitan[ce] to allow [the expert's] supplemental reports to be admitted." *Karnofsky v. Massachusetts Mut. Life Ins. Co.*, No. 2:14-CV-949-PMD, 2016 WL 741285, at *5 (D.S.C. Feb. 25, 2016). As discussed earlier, the court is unmoved by JWA's argument that the May report constitutes a supplemental report under Rule 26(e)(1). The May report without question contains two entirely new opinions not contemplated by the original report.

In sum, the *Southern States* factors do not support JWA's position that the Court should excuse the late expert disclosure and permit Mr. Quinn to testify on these new issues. Accordingly, the Court will preclude Mr. Quinn from testifying about Conclusions 3 and 8 contained in the May report.

Qualifications

**One final point** – the Court notes that, in their reply,[27] Insurers argue that JWA has failed to show by a preponderance of evidence that Mr. Quinn is qualified to testify as an expert witness on *insurance bad faith* under *South Carolina law* because JWA has not "pointed to any cases litigated, articles published, or classes taught by Mr. Quinn concerning South Carolina insurance bad faith. (ECF No. 141 at 3.) (emphasis in original.) Insurers rely solely on *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378 (D. Md. 2001), wherein the court stated that although the expert was "an eminently qualified mechanical engineer and professor of mechanical engineering," he was not an expert in the design, manufacture, operation, or safety of outdoor power equipment. *Id.* at 393. There, the court found the expert was not qualified to opine on the design and safety of a snow thrower and reiterated that to qualify as an expert, the engineer must possess some special skill, knowledge, experience, training, or education concerning the particular issue or product before the court. *Id.* at 392-93.

When determining if an expert's qualifications are sufficient under *Daubert*, the court should "'consider the proposed expert's full range of experience and training,' not just his professional qualifications." *Belk, Inc. v. Meyer Corp., U.S*., 679 F.3d 146, 162 (4th Cir. 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)). "Generally, the test for exclusion is a strict one," and "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in

---

[27] In the background section of their motion, Insurers argue that Mr. Quinn "lacks the expertise and qualifications necessary to provide the expert opinions he proffers." (ECF No. 113 at 2.) However, Insurers do not substantively address this argument in the body of their motion, which is why the Court did not address this argument above. Given that the argument was raised in their initial filing, however, the Court will address the merits of this argument, which are substantively raised by Insurers in their reply.

order to offer an opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc*., 878 F.2d 791, 799 (4th Cir. 1989) (citing *Martin v. Fleissner GMBH*, 741 F.2d 61, 64 (4th Cir. 1984)). "Courts have generally found experts to lack the requisite qualifications only when the proposed expert clearly has no relevant qualifications." *Hoffman v. Kansas City Life Ins. Co*., No. 2:18-CV-00346-DCN, 2019 WL 2297348, at *4 (D.S.C. May 30, 2019).

Insurers take issue with the fact that Mr. Quinn's qualifications, while indisputably robust, fail to show that he has litigated cases, published articles, or taught classes specifically concerning *South Carolina* insurance bad faith.  (ECF No. 141 at 3.) To be sure, it is undisputed that Mr. Quinn is a Texas attorney, not a licensed South Carolina attorney, and JWA does not contend that he has litigated cases, published articles, or taught classes specifically concerning *South Carolina* insurance bad faith (nor does a review of his CV reflect same). However, the Court finds Insurers' reliance on cases where courts have refused to qualify engineers as experts without relevant experience and expertise in the relevant field of engineering misplaced. *See Shreve*, 166 F. Supp. 2d at 378. *See also, e.g., Thompson v. Queen City, Inc*., CIV.A. 2:00–2359–18–DCN, 2002 WL 32345733, at *1 (D.S.C. July 9, 2002) ("Courts have found that a proffered expert who is an engineer is not necessarily qualified to testify as an expert on any issue within the vast field of engineering.")

Here, there is no question that Mr. Quinn has extensive experience ***in the field of insurance claims handling and bad faith***. He was a licensed insurance adjuster until 2015; he has testified as an insurance expert in over 135 cases, some as a bad faith and coverage expert witness; he has published numerous articles for insurance law publications, some addressing bad faith cases; he has given speeches on insurance

issues; he has taught insurance law at four law schools; and he has litigated insurance cases. In *Karnofsky v. Massachusetts Mutual Life Ins. Co.*, the plaintiff proffered an expert to testify on insurance industry standards and what constitutes bad faith in support of its South Carolina bad faith cause of action. 2016 WL 741285, at *2. While the expert's qualifications were not directly before the court, the expert used her knowledge and expertise to opine on defendant's handling of Plaintiff's South Carolina insurance claim, and the court refused to exclude her testimony in this regard "because she is unaware of the intricacies of South Carolina bad-faith law." *Id.* Moreover, the Court finds Mr. Quinn can give opinion testimony based on his specialized knowledge and experience in the insurance claims handling and bad faith area that will help the factfinder understand the evidence or determine a fact in issue.

For all the foregoing reasons, the Court grants in part and denies in part ACE and GSINDA's motion to exclude or limit the testimony of Michael Quinn, as outlined above.

### C.  JWA's Cast Coil Claim

JWA seeks to recover under the Policies' for business interruption losses from the August 4, 2020, fire related to the sale of an intermediary aluminum product called "Cast Coil" that would have been produced by its Legacy Equipment and sold to other aluminum producers from August 5, 2020, through June 2020. (*See* ECF No. 134 at 20.) JWA's consultant, John Petzold, prepared a valuation of JWA's Cast Coil claim and arrived at a net loss of profits for lost cast coil sales in the amount of $165,489,156. (ECF No. 117 at Ex. 19 at Ex. 1.) Insurers filed a motion for summary judgment seeking dismissal of JWA's cast coil claim. (ECF No. 117.) JWA filed a response in opposition, (ECF No. 134), and Insurers filed a reply. (ECF No. 147.)

Given the Court's holding above that the Policies' Molten Material Endorsement's $10 million cap on damages applies to JWA's claim, including its business interruption losses, the Court finds it unnecessary at this time to reach the issue of whether JWA's cast coil claim, seeking damages in excess of $100 million, is subject to dismissal.

Accordingly, the Court denies without prejudice Insurers' motion for summary judgment on JWA's cast coil claim. (ECF No. 117.) For the same reasons, the Court also denies without prejudice Insurers' motion to exclude the report of JWA's Cast Coil expert, Ibrahim Yucel. (ECF No. 120.)

## VI.    CONCLUSION

Based on the foregoing, the Court **denies in part and grants in part** Insurers' motion for summary judgment (ECF No. 118); **denies in part and grants in part** JWA's motion for summary judgment (ECF No. 115); **denies in part and grants in part** ACE and GSINDA's *Daubert* motion to exclude or limit the testimony of Mr. Quinn (ECF No. 113); **denies without prejudice** Insurers' motion for summary judgment on JWA's cast coil claim (ECF No. 117); and **denies without prejudice** Insurers' *Daubert* motion to exclude the report of Mr. Yucel. (ECF No. 120.)

**IT IS SO ORDERED.**

 /s/ Bruce Howe Hendricks
United States District Judge

December 15, 2023
Charleston, South Carolina